IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
*Pro Se* [Non-Prisoner] Complaint Form

**FILED**

SEP - 3 2004

LARRY W. PROPES, CLERK
U. S. DISTRICT COURT

| | |
|---|---|
| *[Enter the full name of the plaintiff in this action]*<br><br>CEFERINA G. HESS,<br>     Plaintiff,<br><br>v. LANDER UNIVERSITY,<br> President DANIEL W. BALL, and THE<br>*[Enter the full name of each defendant in this action. If possible, please list only one defendant per line.]* BOARD OF TRUSTEES, namely:<br> Robin R. Agnew,<br> Ann B. Bowen,<br> Bobby M. Bowers,<br> C. Tyrone Gilmore,<br> Finis E. Horne,<br> Maurice Holloway,<br> Raymond D. Hunt,<br> J. Thomas Kinard,<br> Glenn J. Lawhon, Jr.<br> Mamie W. Nicholson,<br> Anthony Noury,<br> Sally E. Self,<br> George R. Starnes, Chair,<br> Fred Thrailkill,<br> S. Anne Walker,<br> Ricci Land, and<br> M. Craig White.<br> SUSAN C. GOING,<br> LARRY A. JACKSON,<br> WILLIAM T. MARTIN,<br> TIMOTHY L. SNYDER,<br> ARON G. TANNENBAUM, and<br> FRIEDERIKE WIEDEMANN,<br>     Defendants. | Civil Action No. ___8:04-1474-13 AK___<br>*(to be assigned by Clerk)*<br><br><br><br><br>A M E N D E D  C O M P L A I N T |

*If allowed by statute, do you wish to have a trial by jury?* Yes [X]  No [ ]

*[If any answer requires additional space, please use additional paper and attach hereto.]*

## I. PREVIOUS LAWSUITS

 A. *Have you begun other lawsuits in ~~state~~ federal court dealing with the same facts involved in this action?*

Yes [X]  No [ ]  Only to a <u>limited</u> degree as to the facts.

B. *If your answer to A is Yes, describe the lawsuit in the space below. [If more than one lawsuit, describe on another sheet of paper using the same outline.]*

    *1. Parties to this previous lawsuit:*

      *Plaintiff:* __Ceferina Gayo Hess__

      *Defendant(s):* __Lander College, a/k/a Lander University__

    *2. Court:* __U.S. District Court for the District of South Carolina,__ Greenwood
             *(If federal court, name the district; if state court, name the county)*      Division.

    *3. Docket Number:* __C.A. No. 8:92-2339-3AK__

    *4. Name(s) of Judge(s) to whom case was assigned:* __William M. Catoe, Jr.__ (Magistrate Judge)

    *5. Status of Case:* __September 14, 1993 decision against plaintiff__; appealed to the
            *(For example, was the case dismissed? Settled? Appealed? Still Pending?)*
      U.S. Court of Appeals for the 4th Circuit on October 12, 1993 - October 19,

    *6. Date lawsuit was filed:* __August 21, 1992__     1994 decision against plaintiff;
                                               Petition for Certiorari in the

    *7. Date of disposition (if concluded):* October 19, 1994    U.S. Supreme Court denied (late).

C. *Do you have any other lawsuit(s) pending in the federal court in South Carolina?*

    Yes [   ]    No [ X ]

## II. PARTIES

*In Item A below, place your name and address in the space provided. [If additional plaintiffs, do the same on another sheet of paper.]*

A. Name of Plaintiff: __CEFERINA G. HESS__

    Address: __320 Lawson Street, Greenwood, South Carolina 29649-2037__

*In Item B below, place the full name of the defendant, and his/her/its address, in the space provided. Use Item C for additional defendants, if any.*

B. Name of Defendants: __Lander University, President Daniel W. Ball, and the 17__
            Members of the Lander University Board of Trustees (see attached
    Address: __320 Stanley Street, Greenwood, South Carolina 29649__   copy), Susan C.
                                                            Going, Larry A.
                                                            Jackson, William
                                                            T. Martin, Timothy
                                                            L. Snyder, Aron G.
                                                            Tannenbaum, and
                                                            Friederike Wiedemann.

2

C.  Additional Defendants (provide the same information for each defendant as listed in Item B
Above).  Official Business Address for all defendants is the same as in Item B hereof,
except for Dr. Friederike Wiedemann.  However, their specific office, local or home
addresses are as follows:       Dr. Daniel W. Ball, President
                                                      Lander University
                                                      Carnell Learning Center, Rm. 100
                                                      Greenwood, South Carolina 29649

Please see pages 3b and 3c hereof for the office, local or home addresses of the members
of the Lander University Board of Trustees, other defendants, and attorneys of record.

## III.  STATEMENT OF CLAIM

State here, as briefly as possible, the facts of your case.  Describe how each defendant is
involved.  Include also the name(s) of other persons involved, dates, and places.  **Do not give
any legal arrguments or cite nay cases or statutes.**  If you intend to allege a number of related
claims, number and set forth each claim in a separate paragraph.  Use as much space as you
need.  Attach extra sheets of paper if necessary.

To the best of my knowledge, I am the first tenured professor at Lander university in its
130-year history to be wrongfully suspended, locked out of my office of 20 years without notice,
and later wrongfully dismissed without adequate and sufficient cause.  For a brief background of
Plaintiff relative to her tenure at Lander University, please see Exhibit H hereof.

I was hired by Lander University under Affirmative Action guidelines in May of 1975
(see Exhibits A & B hereof), being a woman, a Roman Catholic by religion, belonging to the
Malay race, and a native-born Filipino by national origin.  On March 7, 1977, I became a
naturalized American citizen in Greenville, South Carolina.  I have faithfully served Lander (a
College through June 30, 1992 and a University since July 1, 1992) for more than 27 years.  I
was tenured on August 15, 1978, or for a total number of 24 years.  For all the 27 years that I
was employed by Lander University, I was the only native-born Filipino on the faculty.  I was
promoted to the rank of Associate Professor on March 21, 1983.  Until today,  I remain to be the
only faculty, as to grade in status and length of employment as well as to extent of research and
professional development record, with the lowest salary of $43, 438 (see Exhibit F hereof) at the
time of my employment termination on December 13, 2002.

In 1978 and 1989, inspite of positive recommendations from the Executive Committee
(1978) and the Tenure & Promotion Committee (1989), I was denied promotion by then
President Dr. Larry A. Jackson (from Assistant Professor to Associate Professor in 1978 and
from Associate Professor to Full Professor in  1989).  Also, in three occasions, I was denied by
Lander University the Stranch Endowed Fellowship amounting to $27,500 per grant (the last
one in academic year 2000), inspite of an excellent research record at Lander University.

From May 6, 2002 to December 13, 2002, I was illegally suspended by President
Daniel W. Ball with the endorsement of the Faculty Senate chaired at that time by Defendant
Professor Susan C. Going.

From August 8, 2002 to December 13, 2002, I was illegally locked out of my office by
order of President Ball.  Entry was made only for a few minutes with security or staff officers
on guard.

From May 14, 2002 to June 2002, I was denied summer school Teaching by Chair Dr. William T. Martin with the approval of Vice President for Academic Affairs Dr. Friederike Wiedemann and President Daniel W. Ball. My political science class on East Asian Politics scheduled for that summer with sufficient student enrollees was cancelled on May 2, 2002. My faculty contract (see Exhibit F hereof) was supposed to be valid until May 15, 2002. You will notice also that for academic year 2001-2002 my salary has remained at a very low level after over 27 years of service ($43,438) compared to all other professors in the university who were hired much later than Plaintiff and some did not even have their Ph.D. degrees (see Exhibit G hereof). Furthermore, on April 9, 2002 I signed a Memorandum of Reasonable Assurance sent to me by Vice President for Academic Affairs Wiedemann (see Exhibit E hereof).

In August of 2001 I was denied leave of absence with pay by Chair Dr. William T. Martin. The purpose of this request was to visit the Philippines in order to attend the 100th anniversary of my alma mater, Silliman University. Relative to that visit, I was scheduled to present three lectures on American Politics in three different institutions. My husband, Dr. David L. Hess, with excellent qualifications to teach my courses during my 2-week absence, was not allowed to substitute for me. However, a colleague in another Division was allowed to do so with pay and her husband was also allowed to substitute for 6 weeks. `

I was finally terminated on December 13, 2002 by letter from President Daniel W. Ball and with unanimous approval by the Board of Trustees of Lander University. No specific charges which would warrant Plaintiff's dismissal were made against me pursuant to Section IV of the Lander University Faculty Handbook (see Exhibit D hereof). However, my two chairs (Defendants Snyder and Martin) gave me an overall unsatisfactory performance rating for two successive years (2000-2002) which runs counter to my evaluation records for those years (see Exhibit J hereof). The same was validated by Vice President for Academic Affairs Wiedemann. These ratings also did not adhere to the policies mandated by the Division of History & Political Science regarding Criteria for Performance in 4 areas, namely Teaching, Professional Development, Professional Service, and Advising (see Exhibit I hereof). Incidentally, Vice President for Academic Affairs Wiedemann gave me an outstanding/excellent Seven-Year Review covering the years 1989 to 1996 (see Exhibit K hereof).

During the termination proceedings, President Ball refused 5 times to remove Dr. Kenneth Sanders as chair of the Termination Hearing Committee. He left for a new job as Assistant Dean at the City University of New Jersey four days after he signed the termination decision. Also, two weeks after Vice President for Academic Affairs Wiedemann made her decision to fire me, she accepted a new job as Vice President for Academic Affairs (now as Provost) at Northwestern State University in Wichita Falls, Texas.

3a

Continuation – Page 3a

On the very same day that my appeal was heard by the six members of the Lander University Board of Trustees (December 13, 2002), the Board  terminated Plaintiff the same day, even though eleven other members were not present. According to the letter of dismissal, the decision was unanimous.  Except for Mr. M. Craig White (Fuji Photo Film, Incorporated lawyer), all five members of the Board of Trustees Appeal Committee were graduates of Lander College/University and long-term supporters of President Emeritus Dr. Larry A. Jackson.  In this hearing as well as the Termination Hearing of September 27, 2002, Lander University was represented by 3 lawyers.  Plaintiff did not have any attorney or counsel and only her husband, Dr. David L. Hess, assisted her in these two major proceedings.

President Daniel W. Ball, after 3 repeated requests by letter from Plaintiff Ceferina G. Hess, vehemently refused to publicize my termination as required of him pursuant to Section IV of the Lander University Faculty Handbook.  He also refused to grant Plaintiff Hess any severance pay.

Plaintiff Hess has exhausted all administrative processes through the State of South Carolina Human Affairs Commission  and the U.S. Equal Employment Opportunity Commission (EEOC).  The latter commission adopted the findings of the State of South Carolina Human Affairs Commission, an agency which did not interview any (not even one) of my 31 listed references or witnesses.  Neither did the EEOC interview any of the shortened list of 13 references or witnesses provided by me upon its request.  I received the EEOC dismissal & Notice of Rights to Sue on February 18, 2004 (See Exhibit C hereof).  Hence, this Civil Action pursuant to Title VII of the Civil Rights Act of 1964 et al. is filed before this Honorable Court.

**(Please see attached pages for CHARGES or CAUSES OF ACTION)**

**Continuation:  Answer to Item C**
Local or Home Addresses of the Lander University Board of Trustees & Other Defendants:

1. Mrs. Robin R. Agnew
   Bank of America
   2501 Oak Street
   Myrtle Beach, S.C. 29577

2. Mrs. Ann B. Bowen
   133 Grace Street
   Greenwood, S.C. 29649

3. Mr. Bobby M. Bowers
   Budget and Control Board
   Dennis Building
   Room 425, 1000 Assembly Street
   Columbia, S.C. 29201

4. Dr. C. Tyrone Gilmore
   Spartanburg County School District 7
   Post Office Box 970
   Spartanburg, S.C. 29304

5. Mr. Finis E. Horne
   103 Ridgewood Circle
   Greenwood, S.C. 29649

6. Mr. Maurice Holloway
   4239 Plant Springs Road
   West Columbia, S.C. 29169

7. Mr. Raymond D. Hunt
   Transamerica Occidental Life
       Insurance Company
   2003 Lincoln Street
   Post Office Box 647
   Columbia, S.C. 29550

8. Mr. J. Thomas Kinard
   Pee Dee Electric Corporation
   Post Office Box 491
   Darlington, S.C. 29540

9. Dr. Glenn J. Lawhon, Jr.
   Sandy Memorial Animal Hospital
   318 South Fifth Street
   Hartsville, S.C. 29550

10. Mrs. Mamie W. Nicholson
    The Self Family Foundation
    Post Office Box 1017
    Greenwood, S.C. 29648

11. Mr. Anthony Noury
    1191 Ambling Way
    Mt. Pleasant, S.C. 29464

12. Dr. Sally E. Self
    MUSC Pathology
    165 Ashley Avenue
    Suite 309
    Post Office Box 250908
    Charleston, S.C. 29425

13. Mr. George R. Starnes, Chair
    Northwestern Mutual Insurance Company
    1901 Bull Street
    Columbia, S.C. 29201

14. Mr. Fred M. Thrailkill
    Mount Calvary Presbyterian Church
    1399 Walnut Grove Road
    Roebuck, S.C. 29376

15. Mrs. S. Anne Walker
    Alston Wilkes Society
    3519 Medical Drive
    Columbia, S.C. 29203

16. Ms. Ricci Land
    Land, Parker & Welch, PA
    Post Office Box 138
    Manning, S.C. 29202

17. Mr. M. Craig White
    Vice President for Adm./Pub. Rel./
        Legal Affairs
    Fuji Photo Film, Incorporated
    Post Office Box 1306
    Greenwood, S.C. 29648

Continuation:  <u>Answer to Item C</u>
Local or Home Addresses of Other Defendants:

Prof. Susan C. Going
Jackson Library, Rm. 209
Lander University
Greenwood, S.C. 29649

Dr. Larry A. Jackson
604 Cambridge Avenue W.
Greenwood, S.C. 29646

Dr. William T. Martin
Department of Psychology
Carnell Learning Center
Lander University
Greenwood, S.C. 29649

Dr. Timothy L. Snyder
Department of Psychology
Carnell Learning Center
Lander University
Greenwood, S.C. 29649

Dr. Aron G. Tannenbaum
Department of Political Science
Carnell Learning Center
Lander University
Greenwood, S.C. 29649

Dr. Friederike Wiedemann
Office of the Provost
Midwestern State University
3410 Taft Boulevard
Wichita Falls, Texas 76308-2099

<u>Office Addresses of Attorneys:</u>

Lander University Attorney:

Atty. Vance Bettis
Gigmilliat, Savitz, & Bettis
900 Elmwood Avenue
Columbia, S.C. 29201
Tel. (803) 799-9311

Local Attorney for the Lander University
Board of Trustees:

Atty. Kenneth W. Poston
McDonald Patrick <u>et al</u>. Law Offices
414 Main Street
Greenwood, S.C. 29649
Tel. (864) 229-2511

3c

**III.    STATEMENT OF CLAIM – continued.   (CHARGES or CAUSES OF ACTION)**

## FOR THE FIRST CAUSE OF ACTION
### (DEFAMATION)

l.    The Plaintiff Dr. Ceferina G. Hess (hereinafter referred to as Plaintiff Hess), has been defamed for the rest of her life both professionally and personally because The Lander University Faculty Handbook of 1999, operative when she was suspended by President Dr. Daniel W. Ball (hereinafter referred to as Defendant Ball) on May 6, 2002, clearly specified that in order for a Lander University faculty member, male or female, to be so charged, they had first to be judged "an imminent threat to the University."  Lander's Defendant Ball's Administration so labeled Plaintiff Hess that way but has yet in 2004 to tell her how she was such a threat and what kind of a menace she is.

2.    There is also some question as to whether or not Defendants Ball and/or Wiedemann ever mentioned this "imminent threat" issue regarding Plaintiff Hess to Lander University's Faculty Senate embers, who voted in ultra-secrecy on the afternoon of May 2, 2002, to give Defendant Ball permission to suspend her, something he would do by letter on May 6, 2002. Plaintiff Hess, in fact, had already been heavily defamed previously by Defendant Ball's "intent-to-dismiss" letter to her dated May 3, 2002, three days before she received her suspension letter.

3.    There is a strong possibility that Defendants Ball and Wiedemann named Plaintiff Hess an "imminent threat" to the Lander University community on May 6, 2002, just to pressure her into a quick retirement or resignation per Defendant Ball's "intent-to-dismiss" letter.

4.    One indication that such a "strategic" factor was present on their part was seen in a E-mail of September 25, 2002 from the Plaintiff's attorney Stephen John Henry to her in which he indicated that negotiations between him and Lander University's lawyer Vance Bettis had reached the stage that if Plaintiff Hess agreed to retire, her "slate at Lander University would correspondingly be swept clean," meaning no mention of her being an "imminent threat to Lander University."  Plaintiff Hess refused to consent to this because she had done nothing to deserve such a forced retirement.

5.    Plaintiff Hess had previously written to Defendant Ball several times in June and July of 2002 about this "imminent threat definition issue," but as of today in 2004 has not received an answer from him.

6.    Adding mystery and further complexity to this defamation of the Plaintiff by the Defendants issue was the fact that she had long been defamed by her long-term political science colleague at Lander, Dr. Aron G. Tannenbaum (hereinafter referred to as Defendant Tannenbaum), who for decades had been advising student advisees not to enroll in her classes because he said, "they wouldn't learn anything."  Many years of evaluations of her by students indicated that this was not the case.  Defendant Tannenbaum was

4

present at the ultra-secret meeting of the Faculty Senate on May 2, 2002, that voted to give its permission to Defendant Ball to suspend her. This Faculty Senate meeting was chaired by Professor Susan C. Going (hereinafter referred to as Defendant Going). Conveniently for Defendants Ball and Tannenbaum, Plaintiff Hess had not been invited to attend that meeting nor was she ever apprised as to what was said about her at it and by whom.

7. Defendant Ball did not attend that May 2, 2002 meeting, but Defendant Wiedemann did and probably voiced heavy, unknown, criticism of Plaintiff Hess at it although reportedly neither she nor he voted on the Plaintiff's fate.

8. Plaintiff Hess has been loathe to seek employment either inside or outside of academe since her ultimate cessation of employment by Lander University's Defendant Board of trustees on December 13, 2002 because she would have had to tell any prospective employer of having to leave Lander partly because its officialdom considered her an "imminent threat" to it. This decision has probably cost her thousands of dollars since then in badly needed salary payments. Also, she probably would have had to inform interviewers that she was probably the first tenured professor in Lander's 130-year history, since its founding in 1872, to be let go like that.

## FOR THE SECOND CAUSE OF ACTION
### (AN ILLEGAL SUSPENSION)

9. The suspension this former Lander University associate Professor (Plaintiff Hess), among other things, brings up the issues of a secret indictment under South Carolina law in matters of public personal dismissals. To be investigated relative to this is the identity of the person or persons who decided that the May 2, 2002 Lander University Faculty Senate meeting be ultra-secret with its agenda secret from an uninvited Plaintiff. It was convened by Lander University Faculty Senate President, Professor Susan C. Going, who can be asked as to who decided that the suspension vote be kept secret. There was nothing in the operative Lander University Faculty Handbook about this.

10. It is highly questionable whether the secret opinions of unidentified Lander faculty senators or Defendant Wiedemann who were presented as factual critics of Plaintiff Hess on May 2, 2002 without her knowledge or approval can be considered constitutionally privileged. By presenting such opinions as unrebuttable facts, the people there present placed themselves within areas of defamation not protected by First Amendment protection on opinions.

11. Absent also from the Lander University Faculty Handbook is any mention on what degree of intellectuality each Lander University professor should have. None of the Landerites connected with Plaintiff Hess's suspension ever monitored any of her classes personally. Her professional development over a quarter of a century was consistently meritorious as was her

5

research record of scholarly papers presented and published during that time with 24, many more than most of her Lander University colleagues.

12.  Also of note is the fact that within months after her final dismissal by the Defendant Board of Trustees, Plaintiff Hess's Governments of East Asia and Southeast Asia courses were deleted from Lander University's offerings.

13.  It is also important to note that pre-dismissal finalization in Academe normally gives affected professors time to adjust, plan, and preserve their professional and personal reputations.  These were advantages not available to Plaintiff Hess because of Defendant Ball's method of dismissing her in 2002.

14.  By rushing through an illegal Faculty Senate approval vote on May 2, 2002 to suspend Plaintiff Hess, Defendant Ball at the same time was granting himself extraordinary controls over Plaintiff's behavior for the rest of her time in Lander's employment which ended on December 13, 2002.

## FOR THE THIRD CAUSE OF ACTION
## (BREACH OF CONTRACT)

15.  On the morning of May 2, 2002, hours before Lander University's Faculty Senate met to pass its approval vote, reportedly 12-0 (with about half of its membership absent), to validate Defendant Ball's request to suspend Plaintiff Hess immediately with pay, she  received from Dr. William T. Martin (hereinafter called Defendant Martin), her chairman for academic year 2002-2002, a memo canceling her May 14, 2002 to June 13, 2002 class in Political Science 305 (Governments of East Asia) covering the politics of China and Japan, countries she had studied in on-the-spot on grants in the summers of 1988 and 1990 respectively.  She had taught this course well at Lander since 1978.  Basically, Defendant Martin's memo cancelled this class as of a new faculty calendar year beginning on May 15, 2002, cutting Plaintiff Hess out of badly needed  money for the summer of 2002 when she needed it the most.  Furthermore, it was contrary to the terms of  her April 15, 2002 "Memorandum of Reasonable Assurance" sent to her by Defendant Wiedemann on April 9, 2002 (See Exhibit E hereof).

## FOR THE FOURTH CAUSE OF ACTION
## (A STRONGLY ORCHESTRATED, WRONGFUL TERMINATION CAMPAIGN SUCCEEDS)

16.  The successful campaign of Defendant Ball to force Plaintiff Hess out of her teaching career at Lander University was noteworthy in a number of ways, some of which are these:

(1)  He has never spoken to her about it;

6

(2)  Practically all the charges against her that he signed off on May 3, May 6, and October 17 of 2002 that ushered her out of Lander University after 27 years of distinguished teaching and overall services were those of other people particularly Defendant Wiedemann and alumnus Nathan O. Brown, a former student of Plaintiff Hess burdened by documented long-term, deep psychological problems needing professional help;

(3)  Every faculty vote taken during this force-out campaign which lasted from May to December of 2002 went unanimously against her.  The same held true for the Defendant Board of Trustees vote that rejected her last appeal on December 13, 2002 by a vote of 17-0, although only 6 were present on the same day when the hearing was conducted and the initial decision was rendered;

(4)  On the other hand, the response of over 1,000 of Plaintiff Hess's former students at Lander from 1975 to the Spring of 2002 were universally positive in their testimonial and questionnaire answers received by her in August and September of 2002.  Only 1 of them was negative; and

(5)  Quite noticeable was the mean-spiritedness shown during this termination process by Defendants Ball and Wiedemann.  This was shown by his taking away all of Plaintiff's former faculty privileges on August 8, 2002, including free access to her campus office of 20 years and the use of University mailing and copying facilities, not being allowed to continue teaching and attending faculty meetings, or using University conference rooms and computers.

17.  Plaintiff Hess and her historian husband, Dr. David L. Hess, also note that this unjust force-out was the first affecting a tenured Lander professor in Lander's 130-year history (1872-2002).

18.  Both Plaintiff Hess and her husband have realized that her dismissal by Lander University on December 13, 2002 was caused by the positive whistleblowing that they did about a former Lander College president, Dr. Larry A. Jackson (hereinafter referred to as Defendant Jackson), who had a badly embellished resume, his negative use of students against Plaintiff Hess, and her efforts to maintain university-level classes at Lander when many of her colleagues had given up doing that.

## FOR THE FIFTH CAUSE OF ACTION
### (A CIVIL CONSPIRACY BASED ON COVERING UP BAD CREDENTIALS)

19.  Lander University's President Emeritus Defendant Jackson, like all of us humans, has done good and bad things in a life that had by February 7, 2004 reached 79 years.

20.  On July 1, 1973, Defendant Jackson took over the presidency of Lander College, County of Greenwood, State of South Carolina, on that institution's first day as

state-supported financially. His credentials listed him as having been the President of Santiago College in Santiago, Chile from 1959 to 1964, but his actual title had been its director and it was <u>not</u> a college in the American sense of that word.

21. On April 24, 1978, Defendant Jackson granted tenure to Plaintiff Hess emphasizing the due process protections that would be hers if she ever became involved in a termination procedure. Her due process protection was threefold, to wit:

(1) <u>Affirmative Action</u> protection as a Filipino-American hired by Lander College on May 9, 1975;

(2) <u>Constitutional Rights</u> as a native-born Filipino who became a naturalized American citizen on March 7, 1977 in Greenville, State of South Carolina; and

(3) <u>Academic Freedom</u> flowing from her tenured status as an assistant professor of political science at Lander College from April 15, 1978 onward.

22. On September 18-19, 1979, Dr. Aron G. Tannenbaum (hereinafter referred to as Defendant Tannenbaum) secretly helped plan a student petition to fire Plaintiff Hess who, at that time, was in the midst of her second consecutive year as their 15-faculty member, peer-voted "Teacher of the Year" of the Department of Social Sciences. This planning was done rather openly, first on September 18, 1979 in Defendant Tannenbaum's campus office and on the following day in the lobby of a student dormitory. The student petitionary leaders were members of the Delta Chi Epsilon local Lander fraternity founded the previous year with the help of Defendant Jackson and his wife Barbara.

23. That petition was floated on the Lander College campus, October 7-10, 1979, and was secretly sanctioned by Defendant Jackson. Fortunately, it failed with Plaintiff Hess never seeing it. That it was real was indicated by 5-6 students who came to the Plaintiff's office after having seen it. Defendant Jackson pretended that it had never existed and ordered Plaintiff Hess not to investigate the matter as it would only "create confusion on campus."

24. That Fall of 1979, the members of Lander's Delta Chi Epsilon chapter secretly applied for admission into Defendant Jackson's more prestigious Kappa Sigma International fraternity, of course with his encouragement. He emphasized to them that his own Kappa Sigma membership should always be kept secret on the Lander campus and in South Carolina, especially from Plaintiff Hess.

25. On December 17, 1979, Defendant Jackson sponsored the Delta Chi Epsilons into probationary status in Kappa Sigma International with a letter on presidential stationery and it was granted. So, starting January of 1980, the new Lambda Omega chapter of Kappa Sigma International began establishing itself on the Greenwood campus with probationary status.

26. Many of Defendant Jackson's new fraternal "brothers" and a few "sisters" had

8

been receiving Lander College-generated salaries since 1978 and this would continue. They worked as residential assistants in Lander's sprouting new dorms, in the Student Affairs Office, and on political science internships in South Carolina and Washington, D.C.

27. They were students the normal person would consider least likely to be encouraged by any college president, especially Lander's Defendant Jackson, to purposefully and repeatedly disrupt classes of one of his school's own professors, a person whose due process rights he had guaranteed in 1978. But it happened at South Carolina's Lander College between April 10, 1980 and June 29, 1981. What was so important about those particular dates?

28. On April 10, 1980, at the end of her class in Constitutional Law, Plaintiff Hess left her classroom, as prescribed, to allow her students to, individually, evaluate the course and her instruction of it. As soon as she was gone, the Vice President of Lander's Kappa Sigma chapter jumped to his feet and started roaming the room saying, "Let's mess up these evaluations" (that is, low grade them). His efforts were almost immediately stopped by a classmate, the Student Government Association (SGA) President from Abbeville, South Carolina, who urged their classmates not to do the bidding of this secret fraternal brother of the College's president and he was successful. He went even further by taking the matter to Defendant Jackson's Vice President for Academic Affairs who ignored it.

29. On October 1, 1980, Defendant Jackson wrote a letter on Lander College presidential stationery to Kappa Sigma's headquarters in Virginia sponsoring Lander's probationary chapter for permanency and that same month it became so.

30. The following month, Plaintiff Hess applied for promotion from assistant professorship to associate professorship and was rejected by Defendant Jackson in March of 1981 partly because his own secret Kappa Sigma "brothers" and "sisters" had maliciously and purposefully disrupted some of her peer evaluations (by other faculty members) of her classes. They did this by conversations while she was lecturing. When one group on one side of the classroom would be stopped by her, another small group would start. All this happened to the Plaintiff who had been voted by the Lander community (Administration, faculty, and students) as the "Second Best Teacher of Academic Year 1979-1980."

31. On June 29, 1981, Plaintiff Hess gave Lander University's Executive Committee copies of a 113-page recital of what had been happening to her at Lander College relative to the October 7-10, 1979 and the Kappa Sigma class disruptions of 1980-1981. Defendant Jackson, as the College's president, chaired this largely faculty committee and he saw that it was largely brushed aside by this body. One reason for this, of course, was Defendant Jackson's own secret Kappa Sigma membership, one he has yet to acknowledge publicly today in 2004. In fact, it would not be until June 8, 1982 that the Plaintiff, herself, would know of this affiliation.

32. One major result of that 113-page letter that Plaintiff Hess called her "Portfolio

Letter" was that <u>all</u> disruptions of her classes stopped immediately like the cracking of a whip.

33.  A major dangerous result that did not materialize from Defendant Jackson's encouragement of student aggression against Plaintiff Hess was that some of them did <u>not</u> hurt her physically but it could have happened!

34.  For example, one of the leading anti-Hess petitioners of October 7-10, 1979 had been an alleged student kingpin in the sale of non-prescription drugs to his classmates.  Over time, others would include 3 students with severe psychological problems:  Sam in 1981, Marty in 1987, and Nathan in 2000-2002.  All had close connections with Defendant Tannenbaum.

35.  Then, on June 8, 1982, purely by chance, the Plaintiff's husband, historian Dr. David L. Hess, then of Georgia's LaGrange College, was given access to Defendant Jackson's official alumni file in the Archives of Wofford College, Spartanburg, State of South Carolina.  In it was positive evidence that Defendant Jackson was, indeed, a member of Kappa Sigma, the fraternity that had been bothering Plaintiff Hess so much.  However, it would not be until January of 1995 that she would have documentary evidence that Defendant Jackson had sponsored petition leaders into it in 1980.

36.  Knowing now that Plaintiff Hess was up against the president of her college and a close colleague, Defendant Tannenbaum, who had used some of her students against her in complete disregard of her due process rights, the Plaintiff in the Fall of 1982 began to explore legal options against Lander College.  This led to the Plaintiff's March 23, 1983 promotion from assistant to associate professorship, the last one she would receive while employed by Lander.  During those 19 years (1983-2002), her salary was kept at rank-bottom levels (see Exhibits F & G hereof).

37.  In March of 1985, Defendant Jackson promoted Defendant Tannenbaum from associate to full professorship of political science, breaking a tie, himself, on the evenly divided voting of Lander College's Tenure and Promotion Committee in order to do so.

38.  During 1987, the dangerous game of pitting students against Plaintiff Hess, their teacher, had some negative consequences when a psychologically disturbed student named Marty Long, after being denied "Political Science Student of the Year" honors at Lander College for academic year 1986-1987, threatened to "hurt" the Plaintiff who had voted against him; threatened the lives of two young sons of Mrs. Kathie Dickey (now Whitfield), his classmate who had won the honor that had been denied him; and threatened to bomb the car of still another classmate Student Government Association (SGA) President Miss Andrea Dye (now Mrs. Daniels) who had not supported his quest for undeserved honors. Fortunately, nobody got hurt physically because of this incident, but a badly shaken Mrs. Dickey promptly drove her two sons to Florida for a while to protect them from Marty Long.

10

39. On July 30, 1993, both Defendants Jackson, now Lander University's President Emeritus, following his retirement of June 30, 1992 and Tannenbaum probably obstructed justice on their depositions in the law suit of <u>Hess v. Lander</u> by claiming ignorance as to the year Defendant Tannenbaum had received his full professorship. This was important because in May of 1989 Defendant Jackson, still President of Lander College, rejected the unanimous recommendation to promote Plaintiff Hess to full professorship. His reason was he thought she was a competent but not outstanding teacher. At the same time, he promoted seven others, 6 Caucasian and 1 African-American, to full professorship. His reason for this was not because of his observation of their teaching in classrooms, but his reasoning that "You know an outstanding professor when you see one."

40. After threatening those people, Marty Long was persuaded by Lander officials to check himself into the local Greenwood Self Memorial Hospital for 5 days of observation. Upon his release, he obeyed Lander College orders that he stay away from Plaintiff Hess. Long's backing by Defendants Jackson and Tannenbaum were seen in their support for his receiving a student internship in 1988 with the Democratic Party in Columbia, State of South Carolina, and what was probably a full scholarship to take a master' degree in political science at Kent State University near Akron, Ohio, starting in 1989. While there he married a classmate from France and graduated in 1991. Since then, he reportedly took a government position in Washington, D.C.

## FOR THE SIXTH CAUSE OF ACTION
## (WHISTLEBLOWING BRINGS RETALIATION)

41. Having been rejected for promotion to full professor by the unilateral veto of Defendant Jackson on May 18, 1989, <u>the only time</u> in his 19-year tenure as the president of Lander College that he had rejected a recommendation of the school's Tenure and Promotion Committee for promotion, Plaintiff Hess by 1991 turned to whistleblowing her oppressors Defendants Jackson (President of Lander College until June 30, 1992) and Tannenbaum, Lander's <u>only</u> other political scientist. Fearful of being charged with insubordination for doing this, she relied for the next 11 years (1991-2002) on her historian husband, Dr. David L. Hess, to do this by writing letters with disclaimers to keep her out of responsibility for them.

42. The first one, by the Plaintiff's husband, dated October 27, 1991, was to all members of the Lander College Board of Trustees . It was never answered by any of them. In it, he introduced his wife, the Plaintiff herein, and told of her failure to receive full professorship from Defendant Jackson. Plus, he informed them of Kappa Sigma disruptions of her classes, 1980-1981 ones, that some states like New Jersey considered them as misdemeanors. She also mentioned Defendant Tannenbaum's planning of the October 7-10, l979 "Fire Hess" petition and his advising students not to enroll in her classes. She noted that Tannenbaum had never (1975-1991) evaluated any of her classes

11

on-the-spot.  She also accused Defendant Jackson of using unethical methods since 1978 to circumvent the due process rights of tenure she had received from him that year.

43.  Most importantly in that October 27, 1991 letter to the Lander College Board of Trustees was Dr. David L. Hess's analysis of the professional credentials of their president, Dr. Larry A. Jackson, and his false image of himself as the former President of Santiago College in Santiago, Chile between 1959 and 1964 when he knew his title had been director and that institution was actually a K-12 pre-collegiate academy for English speaking girls in Chile's capital and largest city.  Basically, as of today in 2004, Defendant Jackson has never come clean with the Lander, South Carolina, and American public about this and other questionable aspects of his total professional credentials.  He knows this and the current Lander University Board of Trustees knows about it, too!

44.  By April 30, 1991, in discussing his approaching retirement slated for June 30, 1992, Defendant Jackson, perhaps sensing the Plaintiff's approaching Hess v. Lander law suit, was coming closer to the reality of the past by discussing his family's seven years of residence in Santiago, Chile by telling a reporter from The State newspaper of Columbia, South Carolina that he had spent those seven years as "principal of an American school in Chile."  Actually, he had spent the last four years of them as a "director" of one with the first three being as a United Methodist Church minister of the ecumenical Union (Protestant) Church who self-defrocked in 1959 for unclear reasons.  No longer was he talking about having been "The President of Santiago College."

45.  The previous year in 1990, without consulting the Plaintiff, Defendant Jackson had crippled the political science program by making Defendant Tannenbaum the Director of Lander College's new Honors International Program.  In doing this, the College reduced his teaching to two classes per semester rather than the normal four he had been teaching.  Then in 1991, the South Carolina Commission on Higher Education put that same Lander program on four or five years of probation before a decision would be made as to whether or not it would continue to include a major in that discipline.  Again, Plaintiff Hess was not consulted prior to that Commission making that decision.

46.  In August of 1992, on two consecutive Sunday afternoons around 4:30 p.m., a Recent Lander political science major, while walking his huge dog named "Tucker", came by the Plaintiff's house and talked to her for about half an hour on each occasion.  What he told her was indeed ominous.  The first thing he told her was that the two boys who disrupted one of her Spring 1992 classes had done so deliberately to lower her student evaluations and to force her to call in her chairman, Dr. Robert C. Figueira, to "restore order".  Controlling her class, she didn't do that.  The other major thing he told her was even more troubling, namely that Lander University intended to end its

12

political science major for several years in order to pay her back for suing it (1992-1993).  Importantly, he, Scott Bascue, promised her then that he was willing to witness for her if she ever had to go to court against Defendants Jackson and Tannenbaum.

47.  However, when August 1993 arrived with its last day being the <u>Hess v. Lander</u> trial day at the Greenville, South Carolina Federal Courthouse, Scott Bascue was not there to testify as to what he had told the Plaintiff on those two August Sunday afternoons of the previous year.  He told her that he had taken a management trainee position with Nation's Bank in Abbeville, South Carolina, instead.  Early in 1995, one of Scott's younger brother, both of whom were attending Lander University, told Plaintiff that a Lander University official, which he refused to identify, had told his brother Scott back in June of 1993 that if he testified for Plaintiff Hess his two younger brothers might find it more difficult to graduate from Lander University.

48.  Plaintiff Hess lost that July-August, 1993 case because she couldn't prove that Lander University had been discriminating against her because of her gender, her race-brown-skinned Malay, and her country of origin, the Philippines.  Federal Judge William Catoe, Jr., who presided over that trial, stated in his verdict rendered on September 14, 1993  that Plaintiff Hess had established a <u>prima facie</u> case that Lander University had discriminated against her.

49.  Noteworthy for their absence from the Greenville Federal Courthouse that August day of 1993 was the fact that Lander University's current president Dr. William C. Moran, who had been sponsored as Defendant Jackson's successor by Defendant Jackson, himself, in 1992, was absent from it as were all the Lander University trustees.  Shortly thereafter, President Moran told the Plaintiff that he had been in good health that day but had decided to monitor the proceedings from his Lander University campus office.

50.  In December of 1994 Lander University named the main hallway of its Grier Student Center after Attorney John E. Johnston of Greenville, South Carolina, who had chaired the Lander College Board of Trustees late in 1991 when it refused to answer Dr. David L. Hess's letter of October 27, 1991 that described Defendant Jackson's embellished professional credentials and the use of students against his teacher wife, Plaintiff Hess.  After naming that hallway after Attorney Johnston that evening of Lander's winter commencement of 1994, Defendant President Emeritus Jackson conferred an honorary doctorate of humanities on Mr. Johnston.

51.  Early in 1995 Dr. David L. Hess received a large envelope from Kappa Sigma's international headquarters in Charlottesville, Virginia.  Inside it were copies of Defendant Jackson's two letters that sponsored Lander College's Delta Chi Epsilon into Kappa Sigma.  Now, the Plaintiff and her husband were starting to realize what kind of person Defendant Jackson was.

52. On December 9, 1996 Dr. David L. Hess sent a short one-page letter to all the Lander University trustees deploring the fact that on December 14, 1996 they were going to honor Defendant President Emeritus Jackson with an honorary doctorate at the University's Fall 1996 Commencement after all the letters he had previously sent them concerning his embellished professional credentials and the way he had sanctioned the October 7-10, 1979 student petition against the Plaintiff and the organized disruptions of her classes by his "secret fraternal family members" thereafter. Then, on December 16, 1996, he wrote the editors of all the major South Carolina newspapers describing what had happened at Lander University on December 14, 1996.

53. Dr. David L. Hess's letter to Governor James H. Hodges was one of his best whistleblowing ones but was not well received. Mailed on August 7, 1999, he had failed to acknowledge two months later ever having received it although it was certified and receipt signed by one of his staffers. Acts of retaliation against it and a similar one sent to all members of the South Carolina General Assembly on August 10, 1999 were very decisive and disastrous to the Plaintiff and her husband. How so? David had lost his three classes part-time history teaching job at USC-Aiken by October, 1999 and the Plaintiff had received an intent –to-dismiss letter from Defendant Ball on May 3, 2002. How much more could retaliation have been?

54. Retaliation at Lander University was seen in the Fall of 1999, with Defendant Jackson's close friend Defendant Tannenbaum undercutting the Plaintiff's teaching of the vital, 3 credit hours, Capstone Research Seminar (Political Science 421), by convincing some of the students not to follow Plaintiff Hess's requirement for <u>original 25-30</u> pages research papers, but to slightly extend old term papers they had previously done for Defendant Tannenbaum in his Nuclear Politics course, of course without the Plaintiff's consent. Furious that she wouldn't accept their shoddy, duplicative work, these students, themselves, had other students "mess up" the Plaintiff's course and teacher evaluations from the Fall of 1999 through the Spring of 2002 in some, but not all of the Plaintiff's classes (see Exhibtit J hereof). There was enough of this to allow Defendant Ball to use them to fire the Plaintiff in 2002.

## <u>FOR THE SEVENTH CAUSE OF ACTION</u>
## (NEGLIGENCE OF PUBLIC RESPONSIBILITY)

55. By the Lander College Board of Trustees (hereinafter referred to as Defendant Trustees) for not answering the public service letter of October 27, 1991, to it from Dr. David L. Hess, the Plaintiff's husband, regarding the badly embellished professional credential of the College's president dr. Larry A. Jackson, Defendant Trustees were guilty of negligence tainted with deliberate malice and irresponsibility.

56. During its remaining days of their authority from October 28, 1991 to June 30, 1992, Defendant Trustees willfully failed to answer Dr. David L. Hess's notification letter or inform the public of Defendant Jackson's deceptive credentials.

57. On December 14, 1994, Attorney John E. Johnston, former chairman of the College's Board of Trustees, had the main hallway of the Lander University Grier Center named "The Johnston Commons".  After that, he accepted an honorary doctorate of humanities from the University's Board of Trustees.

58. At the same Winter Commencement ceremony in which Attorney Johnston received that honorary doctorate, Defendant Jackson profusely thanked the College-University Defendant Trustees for the support they had given him.

59. Then at Lander University's Fall Commencement held on December 14, 1996, the University's Defendant Board of Trustees and Lander President Dr. William C. Moran awarded Defendant Jackson an honorary doctorate over the written protests of Dr. David L. Hess who termed this action a deplorable one.

60. Finally, on December 13, 2002, the University's Defendant Board of Trustees rejected the appeal of the Plaintiff and validated Defendant Ball's October 17, 2002 dismissal of her.

61. After that, in a brief letter to the Plaintiff dated December 19, 2003 from Mr. Dennis Drew, education Policy Advisor for Governor Mark Sanford, Mr. Drew stated that the Governor did not have the authority to overrule Lander University's Defendant Board of Trustees.

## FOR THE EIGHTH CAUSE OF ACTION
## (MAINTAINING A HOSTILE WORKING ENVIRONMENT, 1979-2002)

62. On September 18-19, 1979 Defendant Tannenbaum violated the due process rights of Plaintiff Hess by secretly bonding with a small group of Lander College students to plan a petitionary campaign designed to pressure her to resign from her tenured contract with Lander College.

63. In October-November 1979 Defendant Jackson forced the Plaintiff to teach two classes of College Seminar, supposedly a voluntarily-taught course, in the Spring of 1980.

64. Defendant Jackson secretly sanctioned a student petitionary campaign that lasted from October 7, 1979 to October 10, 1979 which was designed to violate Plaintiff's due

15

process rights to an orderly termination of contract with Lander College.

65.  From December 17, 1979 to October 1, 1980, Defendant Jackson secretly sponsored the anti-Plaintiff local Lander College fraternity Delta Chi Epsilon into a secret fraternal relationship with himself in Kappa Sigma, an international college social fraternity.

66.  In April of 1980, Defendant Jackson allowed student LeBron Bright to disrupt one of the Plaintiff's Constitutional Law classes for the purpose of lowering her student evaluations of that class.

67.  Defendant Jackson secretly sanctioned a series of disruptions by secret Kappa Sigma fraternal brothers and sisters of the Plaintiff's classes in 1980-1981.

68.  Defendant Jackson secretly sanctioned a series of student disruptions of some of the Plaintiff's classes from November 1980 to June 29, 1981.

69.  Defendant Jackson, in March of 1978 and 1981, rejected the Plaintiff's application for promotion from assistant to associate professorship of political science at Lander while secretly sharing fraternal bondage with students disrupting some of her classes.

70.  Defendant Jackson saw to it that the Plaintiff's Grievance Committee efforts against Defendant Professor Tannenbaum did not succeed in the Fall of 1981.

71.  Defendant President Jackson helped two members of the faculty's Grievance Committee to get honored positions at the Winter Commencement exercises at Lander College in December, 1981 with its Professor Harry Irwin giving its invocation and its Professor David Dumont giving the commencement address.

72.  In April of 1987 Marty Long threatened to harm the Plaintiff and two of his classmates  and Defendant Jackson did not expel him from Lander College.

73.  Defendant Jackson, on May 18, 1989, vetoed the unanimous recommendation of Lander College's Tenure and Promotion Committee to promote the Plaintiff from an associate professorship in political science to full professorship.

74.  Lander College's Jackson Administration did not assign the Plaintiff any faculty committeeship for academic year 1989-1990.

75.  Lander University's Administration of President William C. Moran allowed a small number of Defendant Professor Tannenbaum's students to low evaluate the

16

Plaintiff during academic year 1999-2000 and violated her contractual due process rights by circulating a failed petition to have her fired.

76. The Administration of Lander University President Dr. William C. Moran did not support the Plaintiff in her April, 2000 Honor Code Violation Committee hearing of students who had cheated in her Fall 1999 Capstone Research Seminar class by systematically failing to follow instructions in her syllabus and by turning in course evaluation forms for 5 absent students.

77. Defendant Vice President for Academic Affairs Wiedemann supported Defendant President Emeritus Jackson in his efforts to continue covering up his embellished professional credentials in November, 2000 by rejecting the Plaintiff's application for the Stranch Endowed Fellowship, a grant to support faculty research.

78. Defendant Wiedemann supported the false charges of student Nathan O. Brown in December, 2000 that the Plaintiff had rumor-mongered the adulterous sexual adventure of a colleague and a just graduated former student.

79. The Administration of Defendant Ball discriminated against the Plaintiff in August of 2001 by not allowing her a 10-day leave with pay to give a series of public lectures in her native Philippines and attend the centennial anniversary of her university there.

80. Defendant Martin discriminated against the Plaintiff during academic year 2001-2002 with a bogus charge that her syllabi were not up to divisional standards.

81. The annual <u>overall</u> professorial evaluations of the Plaintiff for academic years 2000-2001 and 2001-2002 were badly flawed by her chairmen, Defendants Snyder (2000-2001) and Martin (2001-2002). Please see Exhibits I and J hereof.

82. Plaintiff Hess was victimized by a secret vote of Lander University's Faculty Senate on May 2, 2002 in which that body opted to support Defendant President Ball's request to suspend Plaintiff immediately with pay.

83. Defendant President Ball opted to suspend and terminate the Plaintiff in 2002 without speaking a word to her about either penalty, the first of their kinds for a <u>tenured</u> faculty member in Lander's long 130-year history (1872-2002).

## <u>FOR THE NINTH CAUSE OF ACTION</u>
### (OBSTRUCTION OF JUSTICE)

84. The Defendants have obstructed justice in different ways at various times, a few of which are the following:

(1)  In their individual depositions of July 30, 1993, Defendants Jackson and; Tannenbaum both claimed to have forgotten which year Tannenbaum had been promoted to full professorship;

(2)  Defendant Tannenbaum's complete lack of recall in his deposition of July 30, 1993 of a secret letter he had written to Lander College's Academic Dean's Office, dated January 27, 1978, in which he strongly criticized the Plaintiff and her Filipino-American accent;

(3)  Defendant President Ball's failure to seriously look at an approved mountain of evidence, between October 15, 2002 and October 17, 2002, before summarily terminating Plaintiff Hess on the latter date; and

(4)  Defendant President Ball's willful and deliberate failure to transfer <u>all</u> the approved evidence on the Plaintiff's termination issue from himself to the Appellate Defendant Board of Lander University Trustees.

## FOR THE TENTH CAUSE OF ACTION
## (VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS)

85.  On January 17, 2001, Defendant Wiedemann wrote a letter to the Plaintiff falsely charging her with rumor mongering a married colleague's adulterous affair with a recently graduated alumna mother.

86.  On June 18, 2002, and again on August 8, 2002, defendant President Ball charged her with making undesignated derogatory remarks on campus, a charge he eventually used on August 8, 2002 to remove <u>all</u> her faculty privileges, including free accessibility to her campus office of 20 years (1982-2002).

87.  On August 2, 2002 the Plaintiff wrote Defendant President Ball requesting his permission to speak to faculty peers on August 16, 2002 regarding her suspension by him on May 6, 2002, and this request was rejected.

88.  Between December 20, 2002 and February 7, 2002 the Plaintiff requested that Lander University publicize her termination, but Defendant President Ball refused to do so.  Included in those letters was also Plaintiff's request for severance pay which he also refused to respond.

89.  Between April 7, 2004 and April 9, 2004, Plaintiff Hess hand-delivered 140 envelopes of information to the various departments of Lander University regarding her suspension and termination.  Some of these envelopes were intercepted by

Defendant Ball's request and as of September 1, 2004, she has yet to account for all of them.   None of the listed defendants (See pages 3b & 3c hereof) in this law suit have ever denied any of the allegations found in those particular envelopes.

90.  Each and every allegation set forth in the above Causes of Action from the First to the Tenth hereof is hereby fully incorporated in each and every Cause of Action.

WHEREFORE, Plaintiff prays for relief and an award from this Honorable Court from Lander University and each Defendant liable as to each Cause of Action, specifically stated on page 20 hereof.

19

## IV. RELIEF.

*State briefly and exactly what you want this court to do for you.*

As a result of all of the above discriminatory, arbitrary, and wrongful actions on the part of Lander University (Administrators, Faculty, its Board of Trustees, and Students involved), Plaintiff Dr. Ceferina G. Hess (together with her husband Dr. David L. Hess) have suffered untold pain and suffering, emotional and mental anguish and distress for many years, loss of professional reputation and community standing, and severe or extreme financial hardship and economic loss, among others, especially arising from her wrongful suspension from all academic responsibilities by President Daniel W. Ball and the Lander University Faculty Senate, and her subsequent dismissal by the same person (President Ball) on October 17, 2002, later validated unanimously, on appeal by Plaintiff herein, by that University's Board of Trustees on December 13, 2002.

Furthermore, Plaintiff's emotional pain and suffering were exacerbated by Lander University and Defendant' intentional subjection of Plaintiff to an ongoing course of discrimination, harassment, and retaliation with the intention of making her working conditions very hostile in its atmosphere, intolerable, and with the intention of forcing her to resign her employment from Lander University.

For the reasons above stated, Plaintiff hereby requests this Honorable Court to award her compensatory damages for pain and suffering and emotional distress, actual and punitive damages, exemplary damages for loss of pension, retirement, two years severance pay, five years of Teacher and Employee Retention Incentive (TERI) benefits, other lost earnings and income as well as attorney's fees and other legal fees, including postage, xeroxing/printing, and other incental expenses incurred, collectively or in the aggregate sum of TEN MILLION DOLLARS.  Plaintiff also seeks Emeritus Status for her retirement.

Finally, Plaintiff prays that an additional punitive award be granted in an amount sufficient to impress upon the Defendants the seriousness of their conduct and to deter such similar conduct in the future, together with the costs of this action, and such further relief as the Court deems just and appropriate.

*I declare under penalty of perjury that the foregoing is true and correct.*

Signed this **3 rd** day of ___September___, 20 04

---

*Signature of Plaintiff* Pro Se
CEFERINA G. HESS
320 Lawson Street
Greenwood, S.C. 29649

# EXHIBITS

**EXHIBIT A** -- General Policy of Lander University, 2002-2003 Catalog

**EXHIBIT B** -- Affirmative Action & Equal Employment Opportunity Statement, January 25, 1995 (Memos from President William Moran & Director of Human Resources R. Daniel Adams)

**EXHIBIT C** -- EEOC Dismissal & Notice of Rights Received by Dr. Ceferina G. Hess on February 18, 2004

**EXHIBIT D** -- <u>Lander University Faculty Handbook</u> (Quoted from Section IV), 1995 -2002 Edition

**EXHIBIT E** -- Memorandum of Reasonable Assurance from Vice President For Academic Affairs Dr. Friederike Wiedemann dated April 9, 2002

**EXHIBIT F** -- Faculty Contract of Dr. Ceferina G. Hess, August 16, 2001 to May 15, 2002

**EXHIBIT G** -- Lander University Faculty Salaries, 2001-02 (AAUP Figures)

**EXHIBIT H** -- Brief Biographical Sketch of Dr. Ceferina G. Hess

**EXHIBIT I** -- Memorandum from Chair Dr. William T. Martin dated May 6, 2002 to Dr. Ceferina G. Hess  & Other Related Materials on Performance Criteria

**EXHIBIT J** -- Student Teaching Evaluations of Political Science Classes Taught by Dr. Ceferina G. Hess, Spring Semester, 1998 to Spring Semester, 2001

**EXHIBIT K** -- Seven-Year Review (1989-1996) of Dr. Ceferina G. Hess's Performance by Vice President for Academic Affairs Dr. Friederike Wiedemann dated May 1, 1996

* * * * *

# EXHIBIT A

# LANDER UNIVERSITY

## 2002/2003 CATALOG



Lander University reserves the right to make changes in curricula, degree requirements, course offerings, and all academic regulations at any time when, in the judgment of the faculty, the President, or the Board of Trustees, such changes are in the best interest of the students and the University.

Registration at Lander University assumes the student's acceptance of all published regulations as applicable, including both those which appear in this document and all others in any official announcement. This catalog is effective for the 2002-2003 academic year, commencing with the 2002 fall semester and extending through the 2003 summer sessions. This catalog was compiled by Linda Boling of the Office of Academic Affairs.

ADMISSIONS TELEPHONE NUMBERS

| | |
|---|---|
| OFFICE | 864-388-8307 |
| | 1-888-4-LANDER |
| | (1-888 452-6337) |
| FAX | 864-388-8125 |
| EMAIL | admissions@lander.edu |
| HOMEPAGE | www.lander.edu |

GREENWOOD, SOUTH CAROLINA  29649

It is the policy of Lander University to provide equal educational and employment opportunity to all present and future employees and students regardless of race, color, religion, sex, national origin, age, or disability. Lander University is an affirmative action/equal opportunity employer.

# EXHIBIT C

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

*Rec'd.*
*Feb. 18, 2004*
*CGHess*

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Dr. Ceferina G. Hess<br>320 Lawson Street<br>Greenwood, South Carolina 29649 | From: | EEOC<br>129 W. Trade Street<br>Suite 400<br>Charlotte, North Carolina 28202 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 14C-2003-00994 | Cassie Atcherson, S&L Coordinator | (704) 344-6700 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Reuben Daniels*

**Reuben Daniels, Jr., District Director**

**February 13, 2004**
*(Date Mailed)*

Enclosure(s)

cc:    **Vance J. Bettis, Esquire**
       **Gignilliat Law Firm**
       **900 Elmwood, Suite 100**
       **Columbia, South Carolina 29201**

# EXHIBIT  D

<u>Copied from the Original Source</u>:

<u>Lander University Faculty Handbook</u>, June 1999.  Also appearing online at
<u>http://www.lander.edu/senate/handbook/outline.html</u>,  5/21/2001, page 2 of 2.

## NOTICE

THE LANGUAGE USED IN THE LANDER UNIVERSITY <u>FACULTY</u>
<u>HANDBOOK</u> DOES NOT CREATE AND ISNOT INTENDED TO CREATE AN
EMPLOYMENT CONTRACT BETWEEN THE EMPLOYEE AND LANDER
UNIVERSITY.  THIS HANDBOOK IS INTENDED FOR GUIDANCE ONLY,
<u>WITH THE EXCEPTION OF SECTION IV</u>.  LANDER UNIVERSITY
RESERVES THE RIGHT TO REVISE THE CONTENTS OF THIS HANDBOOK
IN WHOLE OR IN PART.

SECTION  IV, Subsection 5, page 11-12:

5. <u>Termination</u>

Termination of an appointment with continuous tenure, or of a probationary
appointment before the end of the term specified in the contract, maybe effected
by the institution only for adequate cause, defined as follows:

a. Demonstrably <u>bona fide</u> institutional decisions (resulting from educational or
financial exigencies, and made only with faculty input) involving the
discontinuance of programs, but only after giving the faculty member twelve
months' notice;

b. Physical or mental inability to fulfill the terms and conditions of the
appointment;

c. Cause, which shall include but not be limited to:  incompetence, neglect of
duty, gross immorality, dishonesty, conviction of a crime for which the
maximum punishment may exceed imprisonment for more than one year,
and willful and repeated violations of University rules and regulations.

Threat of dismissal will not be used to restrain faculty members in the exercise of
academic freedom or other rights of an American citizen.

<u>Notification of Intent to Dismiss</u>.  Dismissal of tenured faculty is a matter of utmost
gravity, and the decision to dismiss must be weighed with a careful regard of the
rights of all parties directly concerned.  The President (or the Vice President for
Academic Affairs if the President is directly involved) will send notification of the
Intent to dismiss to the Faculty Senate.

Continuation, EXHIBIT D, <u>Lander University Handbook</u>, page 12:

Notification of the intent to dismiss, <u>including reasons</u>, will also be sent to the faculty member. At this point the faculty member may resign or request a hearing.

<u>The Decision</u>. Within thirty days after all parties have been heard and all relevant evidence has been examined, the Academic Freedom, Grievance, and Due Process Committee will deliberate and make a recommendation. The President and the faculty member will each be given copies of the written recommendation and a summary of the relevant evidence. <u>Within thirty days of receiving the recommendation of the Academic Freedom, Grievance, and Due Process Committee, the President will decide to dismiss the faculty member or to withdraw the intent to dismiss.</u> (emphasis added)

<u>Lander University Faculty Handbook</u>, pages 12-13:

D. Faculty Evaluation and Faculty Development

In order to achieve the stated purpose of Lander University and to maintain high professional standards, all faculty members will be evaluated to assess strengths and weaknesses; their professional contributions to their discipline, Academic Unit, and the University; and to ensure their professional development. <u>The results of these evaluations must be used for the improvement of the faculty and the educational program</u>. (emphasis added)

<u>Lander University Faculty Handbook</u>, pages 13-14:

   d. <u>Student evaluations</u>.

       The faculty member will not be present during the evaluation. The evaluations will be submitted to the Unit Head, who will retain them until final grades have been submitted. <u>After final grades have been turned in, but no later than seven weeks after the end of final examinations, the evaluations and the results of the evaluations will be returned to the faculty member</u>. The results will also be retained by the Unit Head, with a copy being forwarded to the Vice President for Academic Affairs for inclusion in the faculty member's Evaluation File. (emphasis added)

<u>Lander University Faculty Handbook</u>, page 15:

   e. <u>Unit Head's rating of teaching and related service.</u>

       All full-time faculty members will be evaluated annually by the Unit Head between <u>April 1</u> and <u>May 15</u>. This evaluation will be based on the faculty member's completed <u>Faculty Performance Report</u>, peer evaluations (if appropriate), official student evaluations, <u>and other factors relating to the faculty member's performance which might include but are not limited to</u>

**Continuation, Exhibit D, Lander University Handbook, page 15:**

**effective teaching, student advising, research, publications, grants (both internal and external ), committee work, participation in professional organizations, and University and community service.** It is the responsibility of the faculty member to provide the Unit Head with information and/or documentation concerning all items to be included in the evaluation. **This evaluation should be both formative (promoting self-improvement) and summative (assessing and judging performance).** (emphasis added)

**Lander University Faculty Handbook, page 18:**

4) the **Unit Head Evaluation.**

If a faculty member receives an **overall** rating of 'unsatisfactory' in the annual review, the Unit Head will work with the faculty member to develop a written plan designed to restore satisfactory performance. (The University is committed to providing appropriate assistance to faculty members needing improvement.) The faculty member's progress toward restoring satisfactory performance **will be reflected in future annual evaluations.** Failure of the faculty member to make the required progress toward satisfactory performance **may result in initiating the termination process** as outlined in Section IV.C.5 of the **Faculty Handbook.** (emphasis added)

**Lander University Faculty Handbook, Exhibit D,   SECTION IV.C.2, pages 6-8:**

2. **Appointments of Officers of the University**

c. **Unit Heads.** Appointments as Unit Heads are made by the President at the recommendation of the Vice President for Academic Affairs.

**Unit Heads shall serve a term of three years.** The Unit Head should meet the qualifications for (or currently hold) appointment at the rank of Associate Professor or Professor within the Academic Unit and should meet the qualifications delineated in the published job description filed in the Office of Academic Affairs.

If an internal search is conducted, the current Unit Head will be eligible for nomination, as will any other faculty member who meets the qualifications. The Vice President will solicit nominations from the Unit Faculty members concerning their choice for Unit Head.

If the internal search does not result in the appointment of a Unit Head, then an external search may be necessary. In this case, **the Vice President for Academic Affairs will appoint the search committee and will ensure that all Unit faculty members are consulted.** Internal candidates may apply. At the conclusion of the search, the Vice President will announce the name of the individual who will serve as Unit Head for the next three-year term or will announce the necessity to extend the search. (emphasis added)

# EXHIBIT E



# LANDER
### U N I V E R S I T Y

Office of Academic Affairs

To:          Ceferina Hess

From:        Friederike Wiedemann
             Vice President for Academic Affairs

Date:        April 9, 2002

Subject:     Memorandum of Reasonable Assurance

Determination of the date of issue of your 2002-03 contract awaits action by the General
Assembly.  Nevertheless, you may accept this correspondence as reasonable assurance
that your position will be available to you next year.

If you intend to resume your duties with the University next year, please sign and date
where indicated below and return this memorandum to your unit head by May 1, 2002.  In
turn, the information will be forwarded to this office for preparation of contracts.

Thank you for your continued service to our students in particular and the Lander family
in general.  I am looking forward to working with you next year.

_____              _____
            Signature                                  Date

Greenwood, South Carolina  29649         Telephone (864) 388-8320        Fax (864) 388-8998

# EXHIBIT F

# Faculty Contract

**Name:**       Ceferina Hess                    **SSN:**   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

**Address:**      320 Lawson Street
                Greenwood SC 29649

**Title / Rank:**  Associate Professor/Pol Sci
**Unit:** Hist. & Pol. Sci. Division

## TERMS AND CONDITIONS:

**Effective Dates of Contract:** 8/16/01  **to:**  5/15/02

**Tenured:** 8/15/1978

The rights, privileges, and responsibilities of your appointment are those of a contract employee. The contractual relationship between you and Lander University is governed by the terms of this contract, the Faculty Handbook, and the laws of the State of South Carolina. The salary offered in this contract is subject to the final approval of the governing authorities of South Carolina.

Occasionally, the academic year activities may begin as early as August 12. When this occurs, faculty with nine-month contracts are expected to be on campus for the actual beginning date; and the actual end date will be adjusted accordingly without change to the standard contract dates and pay periods.

**Salary:**                                   **$43,438**

The salary shown above represents the total remuneration for the periods indicated. Your salary is subject to deductions for: 1) withholding taxes, 2) Social Security, 3) retirement system contributions, and 4) any other deductions authorized by you.

Date:  7/18/2001                   Signature: _____
                                         Daniel W. Ball,  President

Date: July 20, 2001               Signature: _____
                                         Ceferina Hess

# EXHIBIT G

## Lander University Faculty Salaries, 2001-02

| AVERAGE SALARY AND RANGE OF SALARIES BY RANK | | |
|---|---|---|
| Note: Twelve-month salaries were converted to a nine-month basis using the AAUP factor of 0.818. Average salary data are not provided in divisional rank categories with less than three faculty members | | |
| **RANK** | **AVERAGE SALARY** | **RANGE** |
| **ALL DIVISIONS** | | |
| Instructor | $33,468 | $26,001 - 44,000 |
| Assistant Professor | $43,328 | $30,001 - 71,000 |
| Associate Professor | $47,400 | $30,001 - 72,000 |
| Professor | $56,656 | $42,001 - 78,000 |
| **HISTORY/POLITICAL SCIENCE** | | |
| Instructor | None | |
| Assistant Professor | None | |
| Associate Professor | N/A | $38,001 - 44,000 |
| Professor | $55,721 | $46,001 - 63,000 |
| **BUSINESS** | | |
| Instructor | None | |
| Assistant Professor | $59,813 | $50,000 - 71,000 |
| Associate Professor | $63,043 | $60,001 - 71,000 |
| Professor | $70,394 | $64,001 - 78,000 |
| **EDUCATION** | | |
| Instructor | None | |
| Assistant Professor | $36,765 | $34,001 - 39,000 |
| Associate Professor | $49,179 | $38,001 - 66,000 |
| Professor | $55,743 | $46,001 - 60,000 |
| **FINE ARTS** | | |
| Instructor | N/A | $30,001 - 34,000 |
| Assistant Professor | $39,844 | $30,001 - 46,000 |
| Associate Professor | $43,841 | $38,001 - 46,000 |
| Professor | $53,109 | $46,001 - 65,000 |
| **PHYSICAL EDUCATION AND EXERCISE STUDIES** | | |
| Instructor | N/A | $26,001 - 31,000 |
| Assistant Professor | $39,890 | $38,001 - 43,000 |
| Associate Professor | N/A | $38,001 - 42,000 |
| Professor | N/A | Greater Than $49,999 |
| **HUMANITIES** | | |
| Instructor | None | |
| Assistant Professor | $34,340 | $30,001 - 36,000 |
| Associate Professor | $45,229 | $38,001 - 60,000 |
| Professor | $55,237 | $46,001 - 62,000 |

## Continuation – EXHIBIT  G

## Lander University Faculty Salaries, 2001-02

| | | | |
|---|---|---|---|
| ASSOCIATE PROFESSOR | McKenzie | Danny | $80,000 |
| PROFESSOR | Morris | Robert | $61,361 |
| PROFESSOR | Mufuka | Kenneth | $56,397 |
| ASSOCIATE PROFESSOR | Natvig | Deborah | $60,384 |
| | Nelson, III | Roscoe | $72,611 |
| PROFESSOR | Phillips | Robert | $54,201 |
| PROFESSOR | Polk | Mary Lynn | $55,042 |
| PROFESSOR | Rieger | Branimir | $54,153 |
| | Roark | Jacquelyn | $68,146 |
| PROFESSOR | Sanders | Rubye | $55,135 |
| ASSOCIATE PROFESSOR | Santandreu | Juan | $60,463 |
| ASSOCIATE PROFESSOR | Scales | Carol | $65,077 |
| ASSISTANT PROFESSOR | Schumacher | Michael | $66,000 |
| PROFESSOR | Shaffer | Dale | $58,681 |
| PROFESSOR | Shurden | Michael | $68,915 |
| PROFESSOR | Sloan | Joseph | $62,145 |
| ASSISTANT PROFESSOR | Smith | Cheri | $52,000 |
| ASSOCIATE PROFESSOR | Smith | Stephanie | $60,326 |
| PROFESSOR | Snyder | Timothy | $52,374 |
| ASSISTANT PROFESSOR | Sridharan | Uma | $70,664 |
| | Suttles | Thomas | $54,672 |
| PROFESSOR              * | Tannenbaum | Aron | $56,901 |
| | Teal | Eleanor | $81,947 |
| ASSISTANT PROFESSOR | Tolbert | Samuel | $58,140 |
| PROFESSOR | Vahjen | Peter | $60,280 |
| PROFESSOR | Vereen | Larry | $56,076 |
| PROFESSOR | Westcott, Jr. | Warren | $58,438 |
| ASSOCIATE PROFESSOR | White | Bruce | $57,370 |
| PROFESSOR | Wiedemann | Friederike | $109,200 |
| ASSOCIATE PROFESSOR | Williams | Betty | $58,236 |
| | Willingham | Martin | $71,107 |
| | **\*For 27 years at Lander, <u>zero</u> publication.** | | |
| Total Records | | | 71 |
| | | | |
| **Actual salaries are reported regardless of length of contract** | | | |

AAUP/aaup11.xls

## Continuation -- EXHIBIT G

### LU Faculty Salaries 2001-02

| Salaries $42,001 - $46,000 | | | |
|---|---|---|---|
| **Rank** | **Last Name** | **First Name** | |
| PROFESSOR | Acorn | Deborah | Came in 1989; Ph.D. in 1989. |
| ASSISTANT PROFESSOR | Beshah | Mammo | Came in 1989; Ph.D. in 1978. |
| ASSOCIATE PROFESSOR | Brown | Helen | Came in 1975; No Ph.D.; MA in 1965. |
| ASSOCIATE PROFESSOR | Carleton | Reese | Came in 1989; Ph.D. in 1976. |
| ASSISTANT PROFESSOR | Chang | Nahn | |
| ASSISTANT PROFESSOR | Daugherty | Bernice | |
| INSTRUCTOR | Douglas | Mary | |
| ASSOCIATE PROFESSOR | Hess | Ceferina * | Came in 1975; Ph.D. in 1975. |
| ASSOCIATE PROFESSOR | Hunter | Jill | Came in 1994; Ph.D. in 1991. |
| ASSOCIATE PROFESSOR | Jackson, Jr | Frank | Came in 1972; No Ph.D.; MMC in 1988. |
| ASSOCIATE PROFESSOR | Lawson | Don | Came in 1989; Ph.D. in 1989. |
| ASSISTANT PROFESSOR | Neely | Linda | |
| ASSOCIATE PROFESSOR | Noonkester | Lila | Came in 1988; No Ph.D.; DMA in 1988. |
| ASSISTANT PROFESSOR | Parrish | Lydia | |
| ASSOCIATE PROFESSOR | Pitts | Tom | Came in 1989; Ph.D. in 1988. |
| ASSOCIATE PROFESSOR | Poe | Robert | Came in 1972; No Ph.D.; MA in 1972. |
| ASSOCIATE PROFESSOR | Runyan | Michael | Came in 1974; No Ph.D.; MS in 1978. |
| ASSISTANT PROFESSOR | Sacoco | Charles | |
| ASSOCIATE PROFESSOR | Sanders | Kenneth | Came in 1992; MFA in 1989; Ph.D. in 2002. |
| ASSOCIATE PROFESSOR | Schlindwein | Charles | Came in 1996; Ph.D. in 1993. |
| ASSOCIATE PROFESSOR | Slimmer | David | Came in 1993; Ph.D. in 1995. |
| Total Records | | 21 | |

*The only one with Ph.D. at Lander for 27 years (24 years tenured), with a salary of $43,438 in 2001-2002.

| Salaries $46,001 - $49,999 | | | |
|---|---|---|---|
| **Rank** | **Last Name** | **First Name** | |
| PROFESSOR | Criswell | Paul | |
| PROFESSOR | Edwards | Patrick | Came in 1990; Ph.D. in 1984. |
| PROFESSOR | Lenti | Marianne | |
| ASSOCIATE PROFESSOR | Lux, III | Fordyce | |
| ASSOCIATE PROFESSOR | McDowell | Betty | |
| PROFESSOR | Mecca | Marilyn | |
| PROFESSOR | Paquette | Jean | Came in 1989; Ph.D. in 1987. |
| ASSOCIATE PROFESSOR | Taylor | Robert | |
| PROFESSOR | Whitsitt | Julia | |
| ASSOCIATE PROFESSOR | Williams | Betty | |
| PROFESSOR | Wilson | Carol | |
| PROFESSOR | Wohlford | Roger | |
| Total Records | | 12 | |

**Twelve-month salaries were converted to a nine-month equivalent using the AAUP factor of 0.818**

AAUP/aaup8.xls

# EXHIBIT H

## Biographical Sketch
### of
### Dr. Ceferina Gayo Hess

A native of Dumaguete City, Philippines, Dr. Ceferina Gayo Hess came to the United States in 1968 as an exchange graduate student at Southern Illinois University in Carbondale. She was a recipient of a 4-year teaching assistantship although the first year was devoted to research. After graduation from Southern Illinois University, she joined the faculty of Lander University in Greenwood, South Carolina in 1975. As an associate professor of Political Science, she has taught a total of 18 different political science courses such as American National Government, American Political Theory, The Politics of East Asia and Southeast Asia, International Law, Constitutional Law, Judicial Process, Civil Rights and Civil Liberties, Public Policy, and World Politics. She obtained <u>tenure</u> at Lander in 1978. Since then, she has been her department's "Teacher of the Year" twice and Lander's "Second Best Teacher of the Year" once. Among others, she was listed <u>4</u>[th] out of 130 faculty in an SGA election for Distinguished Professor, was voted once by Phi Mu as Professor of the Month in 1998, recipient of a "Super Teacher Award" from Gamma Phi Beta in 2000, and the <u>only</u> recipient of an "Award of Excellence" in 2001 out of 14 Fulbrighters who went to India in 1994 from Professor Emeritus/Director Dr. Donald R. Bailey of Francis Marion University in Florence, South Carolina.

Her academic credentials are as follows:

B.A. in Social Sciences, Silliman University, Philippines, 1958
LL.B. (Law), Silliman University, Philippines, 1962
M.A. in Government, Southern Illinois University in Carbondale, 1970
Ph.D. in Political Science, Southern Illinois University in Carbondale, 1975
Certificate, Chinese Studies, China Fulbright Program, Beijing Normal
      University, 1988
Certificate, Japan Studies, San Diego State University (1989), followed by
      a six-week travel seminar to Japan in 1990 (through the American
      Association of State Colleges & Universities or AASCU)
Certificate, Indian Studies, India Fulbright Program, Stella Maris College,
      Madras, India (1994)

She serves as a member of the Board of Directors of the National Social Science Association since 1994. She is a member of the Third World Studies Association since 1995, the Southeast Conference/Association for Asian Studies since 1976, and the South Carolina Political Science and Historical Associations since 1977. She served as a member of the Executive Board of the South Carolina Political Science Association from 1986 to 1988. She has presented and/or published more than 24 papers/articles, 6 encyclopedic essays, and several book reviews on Asian and American politics. She is the recipient of <u>9</u> national competitive grants that took her to China, Japan, India, San Francisco, San Diego, Washington, D.C., Chicago, Jekyl Island, and Atlanta, Georgia allowing her to travel to these places and attend educational seminars and workshops in the field of political science and other areas. Finally, she was instrumental in organizing and/or presenting <u>113</u> Fine Arts Lectureship Series (FALS)-approved community programs at Lander that allowed many students to graduate with 15 hours of FALS credit.

# EXHIBIT I

Date: May 6, 2002

To: Dr. Ceferina Hess

Copies to: Dr. D. Ball, Professor S. Going, Dr. F. Wiedemann

From: Dr. William T. Martin/Chair of History and Political Science    *WTM*

Re: Your spring 2002 student evaluations

Your annual evaluation for the 2001-2002 academic year was based on your spring 2001 and fall 2001 student evaluations, not on your spring 2002 student evaluations.

Ms McIntyre has not finished processing the spring 2002 evaluations. You will receive the results of your spring 2002 evaluations at the same time as all other faculty in the Division of History and Political Science receive theirs.

## History & Political Science Division
## Minutes
### September 20, 2001
### 12:15pm

**Attending:**    W.T.Martin (Chair),  M. Avey, J. Paquette, J. Cleland, K.Mufuka, M. Cann,  A. Tannenbaum, C.Hess and R. Figueira.  Absent: M.Cann.

**Minutes:**    Minutes of  August 20th, 2001  were approved.

**General Announcements:**
- Dr. Martin stated that the division's merit criteria form will be used for faculty evaluation beginning this year.
- The University is thinking of using a campus-wide student evaluation system (IDEA form).
- Dr. Ball wants to examine the General Education curriculum and viability of current programs. Ad hoc committees will be formed to review these two items.
- Dr. Tannenbaum discussed a new course proposal for public administration (special topics course numbers).  All were in favor to approve the proposal.
- Dr. Tannenbaum reported from the Senate that a formal attendance policy is being discussed.
- Dr. Cleland announced that a public lecture by Harvey Teal and an exhibit in the Monsanto Gallery will be held on October 10th
- Dr. Martin asked the faculty to let him know what they would like to do for LU 101 – part 2.

Meeting Adjourned at 1:05pm.

Respectfully Submitted,

_____
Lori McIntyre
Administrative Specialist

# Continuation -- EXHIBIT I

## DIVISION OF HISTORY AND POLITICAL SCIENCE
### Criteria for Satisfactory and Meritorious Performance

The faculty of the Division of History and Political Science define merit as performance over and above normal expectations in four distinct categories: teaching, advising, professional development, and service. Given the mission of Lander University, we feel that teaching is the number one priority of the institution. Therefore, in order to be considered for merit pay, a faculty member must demonstrate meritorious performance in the area of teaching. Here, we define meritorious performance as meeting all of the satisfactory criteria and at least two of the meritorious criteria in the teaching category. In addition, it is expected that the faculty member meet all of the satisfactory criteria and at least two more meritorious criteria in two of the three other areas of performance (i.e., advising, professional development, and service).

## TEACHING

### CRITERIA FOR SATISFACTORY PERFORMANCE

**Sat.    UnSat.    N/A**

a. Fully utilizes class periods.
b. Uses accurate, current syllabi and adheres to syllabi.
c. Displays competency in subject matter of courses being taught.
d. Provides appropriate feedback of students' performance in a timely fashion.
e. Maintains posted office hours.
f. Treats students professionally and ethically.
g. Utilizes teaching techniques/materials that are conducive to the learning environment.
h. Possesses skill in conveying information to students.
i. Able to communicate and establish professional rapport with students.
j. Has had no major legitimate complaints from students concerning tests, grades, lectures. (**Nathan O. Brown, the only student with a major complaint, lost his appeal.**)
k. Receives satisfactory evaluations from students of at least 3.5 on a 5.0 scale for one of the two semesters of a given academic year.

**Note:  Dr. Ceferina G. Hess has satisfactorily met all the above requirements. Please take careful note of Item k above re student evaluations.**

### CRITERIA FOR MERITORIOUS PERFORMANCE

a. Promotes students' attendance/participation at conferences and meetings.
b. Arranges field trips or other activities outside the classroom that enhance the learning process.
c. Develops new courses to reflect the development of the discipline or the needs the program.
d. Substantially revises old courses to reflect the development of the discipline.
e. Expands intellectual and academic credentials.
f. Engages students in the research process beyond the normal teaching experience.
g. Receives high evaluations from student evaluations (mean greater $\geq$ than 4.00 in teaching specific items).
h. Uses new technology in teaching.
i. Teaches an interdisciplinary course with a person from another discipline.
j. Directs independent studies and/ or internships.
k. Other

## EXHIBIT  J

## DIVISION OF HISTORY & POLITICAL SCIENCE
### Summary Report of Student Evaluations
### Spring Semester, 1998 to Spring Semester, 2001
### Faculty:  Dr. Ceferina G. Hess
<u>Note</u>:  Division Rating for Satisfactory is <u>3.50</u> on a scale of <u>5.00</u>.

| Spring Semester, 1998 | Total # of Participant Responses | Average Response |
|---|---|---|
| Pols 103.01 | 180 | 4.12** |
| Pols l03.03 | 354 | 4.01** |
| Pols 304.04 | 378 | 4.12 |
| Pols 350.10 | 218 | 4.07 |
| **Fall Semester, 1999 (Period of Capstone Seminar Student Retaliation)*** | | |
| Pols 103.05 | 334 | 3.75 |
| Pols 103.03* (Conspiring Students Enrolled) | 177 | 3.10* (Compare**) |
| Pols 421.08* (<u>10</u> Students Filled up Forms, But <u>15</u> Forms Turned In.)* | 258 | 3.18* |
| Pols 340.06 | 240 | 3.82 |
| **Spring Semester, 2000** | | |
| Pols 103.05 | 334 | 3.84 |
| Pols 305.06 | 280 | 3.44 |
| Pols 313.08 | 409 | 3.46 |
| **Fall Semester, 2000** | | |
| Pols 312.10 | 339 | 3.60 |
| Pols 101.07* (Almost the whole class composed | 653 | 2.45* |
| Pols 304.04          of students on Probation.)* | 199 | 4.17 |
| **Summer, 2001** | | |
| Pols 101.10 | 121 | 4.24 |
| **Fall·Semester, 2001** | | |
| Pols 101.07 | 535 | 3.54 |
| Pols 313.10 | 258 | 3.84 |
| **Spring Semester, 2001** | | |
| Pols 230.04 | 359 | 4.03 |
| Pols 350.10 | 253 | 3.98 |
| Pols 101.05 | 384 | 3.55 |

<u>Note</u>:  Chair Dr. William T. Martin's Memo of April 31, 2002 states that my overall evaluation for  academic year 2002 is <u>3.60</u>, which is therefore <u>above Satisfactory</u>.  See above note.

## EXHIBIT K

**Ceferina Hess**
**Division of History and Political Science**
**Seven Year Review (1989-1996)**

The meeting between the faculty member, the chair, and the Vice President for Academic Affairs called for by the underline Faculty Handbook took place on Wednesday, May l, 1996.

Peer evaluations are complimentary as is that of the chair. Dr. Hess has served Lander University for a long time and has contributed much to her discipline of Political Science.

<u>Teaching</u>:

Dr. Hess is an enthusiastic teacher. Peers comment on the fact that she lectures without notes and that she always has the answer no matter what questions her students might ask her. She is obviously a well versed political scientist. Her students' responses on the evaluation seem mixed. The reason may be that Dr. Hess chooses to evaluate all of her courses. We spoke about possibly selecting the ones that will be used for her official evaluation since the <u>Faculty Handbook</u> requires evaluation in two classes only. We considered as well the administration of the evaluation forms in class.

Dr. Hess actively participates in the development of the Political Science curriculum, a fact that I much appreciate. We spoke about focusing her activities in this regard and prioritizing them.

While the Division has just begun its evaluation of advising and while, therefore, no formal student evaluation is advisable, there is every reason to believe that Dr. Hess is a conscientious and concerned advisor.

<u>Scholarly Activity</u>:

Dr. Hess is a prolific writer and regularly publishes and gives papers. In the opinion of her chair, she is now ready to submit her work to journals with higher standards than those through which she has published her work so far. I would encourage her to follow that advice.

<u>Service</u>:

Dr. Hess is very active in the area of service which usually benefits her students. She has mounted a large number of FALS credit bearing lectures. Another commendable activity in this regard is the fact that she has given numerous papers to community groups.

Finally, I would like to commend Dr. Hess on her willingness to work with her colleagues in a collegial manner even when this is not easy.

It is a pleasure to have Dr. Hess as a colleague.

_Friederike Wiedemann_                    _May 1, 1996_
_____          _____
Friederike Wiedemann                    Date