FILED

8:04 - 1474 - 13AK

SEP 1 0 2004

LARRY W. PROPES, CLERK
U. S. DISTRICT COURT

C.  **Additional Defendants** (provide the same information for each defendant as listed in Item B
Above). Official Business Address for all defendants is the same as in Item B hereof,
except for Dr. Friederike Wiedemann.  However, their specific office, local or home
addresses are as follows:    Dr. Daniel W. Ball, President
                             Lander University
                             Carnell Learning Center, Rm. 100
                             Greenwood, South Carolina 29649

Please see pages 3b and 3c hereof for the office, local or home addresses of the members
of the Lander University Board of Trustees, other defendants, and attorneys of record.

## III.  STATEMENT OF CLAIM

State here, as briefly as possible, the facts of your case.  Describe how each defendant is
involved.  Include also the name(s) of other persons involved, dates, and places.  **Do not give
any legal arguments or cite any cases or statutes.**  If you intend to allege a number of related
claims, number and set forth each claim in a separate paragraph.  Use as much space as you
need.  Attach extra sheets of paper if necessary.

To the best of my knowledge, I am the <u>first tenured professor</u> at Lander university in its
130-year history to be wrongfully suspended, locked out of my office of 20 years without notice,
and later wrongfully dismissed without adequate and sufficient cause.  For a brief background of
Plaintiff relative to her tenure at Lander University, please see Exhibit H hereof.

I was hired by Lander University under Affirmative Action guidelines in May of 1975
(see Exhibits A & B hereof), being a woman, a Roman Catholic by religion, belonging to the
Malay race, and a native-born Filipino by national origin.  On March 7, 1977, I became a
naturalized American citizen in Greenville, South Carolina.  I have faithfully served Lander (a
College through June 30, 1992 and a University since July 1, 1992) for more than 27 years.  I
was <u>tenured</u> on August 15, 1978, or for a total number of <u>24</u> years.  For all the 27 years that I
was employed by Lander University, I was the <u>only native-born</u> Filipino on the faculty.  I was
promoted to the rank of Associate Professor on March 21, 1983.  Until today,  I remain to be the
only faculty, as to grade in status and length of employment as well as to extent of research and
professional development record, with the lowest salary of $43, 438 (see Exhibit F hereof) at the
time of my employment termination on December 13, 2002.

In 1978 and 1989, inspite of positive recommendations from the Executive Committee
(1978) and the Tenure & Promotion Committee (1989), I was denied promotion by then
President Dr. Larry A. Jackson (from Assistant Professor to Associate Professor in 1978 and
from Associate Professor to Full Professor in  1989).  Also, in three occasions, I was denied by
Lander University the Stranch Endowed Fellowship amounting to $27,500 per grant (the last
one in academic year 2000), inspite of an excellent research record at Lander University.

From May 6, 2002 to December 13, 2002, I was illegally suspended by President
Daniel W. Ball with the endorsement of the Faculty Senate chaired at that time by Defendant
Professor Susan C. Going.

From August 8, 2002 to December 13, 2002, I was illegally locked out of my office by
order of President Ball.  Entry was made only for a few minutes with security or staff officers
on guard.

10

III.    STATEMENT OF CLAIM – continued.   (CHARGES or CAUSES OF ACTION)

## FOR THE FIRST CAUSE OF ACTION
### (DEFAMATION)

1.   The Plaintiff Dr. Ceferina G. Hess (hereinafter referred to as Plaintiff Hess), has been defamed for the rest of her life both professionally and personally because The Lander University Faculty Handbook of 1999, operative when she was suspended by President Dr. Daniel W. Ball (hereinafter referred to as Defendant Ball) on May 6, 2002, clearly specified that in order for a Lander University faculty member, male or female, to be so charged, they had first to be judged "an imminent threat to the University."  Lander's Defendant Ball's Administration so labeled Plaintiff Hess that way but has yet in 2004 to tell her how she was such a threat and what kind of a menace she is.

2.   There is also some question as to whether or not Defendants Ball and/or Wiedemann ever mentioned this "imminent threat" issue regarding Plaintiff Hess to Lander University's Faculty Senate members, who voted in ultra-secrecy on the afternoon of May 2, 2002, to give Defendant Ball permission to suspend her, something he would do by letter on May 6, 2002. Plaintiff Hess, in fact, had already been heavily defamed previously by Defendant Ball's "intent-to-dismiss" letter to her dated May 3, 2002, three days before she received her suspension letter.

3.   There is a strong possibility that Defendants Ball and Wiedemann named Plaintiff Hess an "imminent threat" to the Lander University community on May 6, 2002, just to pressure her into a quick retirement or resignation per Defendant Ball's "intent-to-dismiss" letter.

4.   One indication that such a "strategic" factor was present on their part was seen in an E-mail of September 25, 2002 from the Plaintiff's attorney Stephen John Henry to her in which he indicated that negotiations between him and Lander University's lawyer Vance Bettis had reached the stage that if Plaintiff Hess agreed to retire, her "slate at Lander University would correspondingly be swept clean," meaning no mention of her being an "imminent threat to Lander University."  Plaintiff Hess refused to consent to this because she had done nothing to deserve such a forced retirement.

5.   Plaintiff Hess had previously written to Defendant Ball several times in June and July of 2002 about this "imminent threat definition issue," but as of today in 2004 has not received an answer from him.

6.   Adding mystery and further complexity to this defamation of the Plaintiff by the Defendants issue was the fact that she had long been defamed by her long-term political science colleague at Lander, Dr. Aron G. Tannenbaum (hereinafter referred to as Defendant Tannenbaum), who for decades had been advising student advisees not to enroll in her classes because he said, "they wouldn't learn anything."  Many years of evaluations of her by students indicated that this was not the case.  Defendant Tannenbaum was

4

present at the ultra-secret meeting of the Faculty Senate on May 2, 2002, that voted to give its permission to Defendant Ball to suspend her. This Faculty Senate meeting was chaired by Professor Susan C. Going (hereinafter referred to as Defendant Going). Conveniently for Defendants Ball and Tannenbaum, Plaintiff Hess had not been invited to attend that meeting nor was she ever apprised as to what was said about her at it and by whom.

7. Defendant Ball did not attend that May 2, 2002 meeting, but Defendant Wiedemann did and probably voiced heavy, unknown, criticism of Plaintiff Hess at it although reportedly neither she nor he voted on the Plaintiff's fate.

8. Plaintiff Hess has been loathe to seek employment either inside or outside of academe since her ultimate cessation of employment by Lander University's Defendant Board of Trustees on December 13, 2002 because she would have had to tell any prospective employer of having to leave Lander partly because its officialdom considered her an "imminent threat" to it. This decision has probably cost her thousands of dollars since then in badly needed salary payments. Also, she probably would have had to inform interviewers that she was probably the <u>first</u> tenured professor in Lander's 130-year history, since its founding in 1872, to be let go like that.

## FOR THE SECOND CAUSE OF ACTION
### (AN ILLEGAL SUSPENSION)

9. The suspension this former Lander University associate Professor (Plaintiff Hess), among other things, brings up the issues of a secret indictment under South Carolina law in matters of public personal dismissals. To be investigated relative to this is the identity of the person or persons who decided that the May 2, 2002 Lander University Faculty Senate meeting be ultra-secret with its agenda secret from an uninvited Plaintiff. It was convened by Lander University Faculty Senate President, Professor Susan C. Going, who can be asked as to who decided that the suspension vote be kept secret. There was nothing in the operative <u>Lander University Faculty Handbook</u> about this.

10. It is highly questionable whether the secret opinions of unidentified Lander faculty senators or Defendant Wiedemann who were presented as factual critics of Plaintiff Hess on May 2, 2002 without her knowledge or approval can be considered constitutionally privileged. By presenting such opinions as unrebuttable facts, the people there present placed themselves within areas of defamation not protected by First Amendment protection on opinions.

11. Absent also from the <u>Lander University Faculty Handbook</u> is any mention on what degree of intellectuality each Lander University professor should have. None of the Landerites connected with Plaintiff Hess's suspension ever monitored any of her classes personally. Her professional development over a quarter of a century was consistently meritorious as was her

5

(2)  Practically all the charges against her that he signed off on May 3, May 6, and October 17 of 2002 that ushered her out of Lander University after 27 years of distinguished teaching and overall services were those of other people particularly Defendant Wiedemann and alumnus Nathan O. Brown, a former student of Plaintiff Hess burdened by documented long-term, deep psychological problems needing professional help;

(3)  Every faculty vote taken during this force-out campaign which lasted from May to December of 2002 went unanimously against her.  The same held true for the Defendant Board of Trustees vote that rejected her last appeal on December 13, 2002 by a vote of 17-0, although only 6 were present on the same day when the hearing was conducted and the initial decision was rendered;

(4)  On the other hand, the response of over 1,000 of Plaintiff Hess's former students at Lander from 1975 to the Spring of 2002 were universally positive in their testimonial and questionnaire answers received by her in August and September of 2002.  Only 1 of them was negative; and

(5)  Quite noticeable was the mean-spiritedness shown during this termination process by Defendants Ball and Wiedemann.  This was shown by his taking away all of Plaintiff's former faculty privileges on August 8, 2002, including free access to her campus office of 20 years and the use of University mailing and copying facilities, not being allowed to continue teaching and attending faculty meetings, or using University conference rooms and computers.

17.  Plaintiff Hess and her historian husband, Dr. David L. Hess, also note that this unjust force-out was the first affecting a tenured Lander professor in Lander's 130-year history (1872-2002).

18.  Both Plaintiff Hess and her husband have realized that her dismissal by Lander University on December 13, 2002 was caused by the positive whistleblowing that they did about a former Lander College president, Dr. Larry A. Jackson (hereinafter referred to as Defendant Jackson), who had a badly embellished résumé, his negative use of students against Plaintiff Hess, and her efforts to maintain university-level classes at Lander when many of her colleagues had given up doing that.

## FOR THE FIFTH CAUSE OF ACTION
### (A CIVIL CONSPIRACY BASED ON COVERING UP BAD CREDENTIALS)

19.  Lander University's President Emeritus Defendant Jackson, like all of us humans, has done good and bad things in a life that had by February 7, 2004 reached 79 years.

20.  On July 1, 1973, Defendant Jackson took over the presidency of Lander College, County of Greenwood, State of South Carolina, on that institution's first day as

7

39.  On July 30, 1993, both Defendants Jackson, now Lander University's President Emeritus, following his retirement of June 30, 1992, and Tannenbaum probably obstructed justice on their depositions in the law suit of <u>Hess v. Lander</u> by claiming ignorance as to the year Defendant Tannenbaum had received his full professorship.  This was important because in May of 1989 Defendant Jackson, still President of Lander College, rejected the unanimous recommendation to promote Plaintiff Hess to full professorship.  His reason was he thought she was a competent but not outstanding teacher.  At the same time, he promoted seven others, 6 Caucasian and 1 African-American, to full professorship.  His reason for this was not because of his observation of their teaching in classrooms, but his reasoning that "You know an outstanding professor when you see one."

40.  After threatening those people, Marty Long was persuaded by Lander officials to check himself into the local Greenwood Self Memorial Hospital for 5 days of observation.  Upon his release, he obeyed Lander College orders that he stay away from Plaintiff Hess.  Long's backing by Defendants Jackson and Tannenbaum were seen in their support for his receiving a student internship in 1988 with the Democratic Party in Columbia, State of South Carolina, and what was probably a full scholarship to take a master' degree in political science  at Kent State University near Akron, Ohio, starting in 1989.  While there he married a classmate from France and graduated in 1991.  Since then, he reportedly took a government position in Washington, D.C.

## FOR THE SIXTH  CAUSE OF ACTION
## (WHISTLEBLOWING BRINGS RETALIATION)

41.  Having been rejected for promotion to full professor by the unilateral veto of Defendant Jackson on May 18, 1989, <u>the only time</u> in his 19-year tenure as the president of Lander College that he had rejected a recommendation of the school's Tenure and Promotion Committee for promotion, Plaintiff Hess by 1991 turned to whistleblowing her oppressors Defendants Jackson (President of Lander College until June 30, 1992) and Tannenbaum, Lander's <u>only</u> other political scientist.  Fearful of being charged with insubordination for doing this, she relied for the next 11 years (1991-2002) on her historian husband, Dr. David L. Hess, to do this by writing letters with disclaimers to keep her out of responsibility for them.

42.  The first one, by the Plaintiff's husband, dated October 27, 1991, was to all members of the Lander College Board of Trustees .  It was never answered by any of them.  In it, he introduced his wife, the Plaintiff herein, and told of her failure to receive full professorship from Defendant Jackson.  Plus, he informed them of Kappa Sigma disruptions of her classes, 1980-1981 ones, that some states like New Jersey considered them as misdemeanors.  She also mentioned Defendant Tannenbaum's planning of the October 7-10, 1979 "Fire Hess" petition and his advising students not to enroll in her classes.  She noted that Tannenbaum had never (1975-1991) evaluated any of her classes

11

on-the-spot.  She also accused Defendant Jackson of using unethical methods since 1978 to circumvent the due process rights of tenure she had received from him that year.

43.  Most importantly in that October 27, 1991 letter to the Lander College Board of Trustees was Dr. David L. Hess's analysis of the professional credentials of their president, Dr. Larry A. Jackson, and his false image of himself as the former President of Santiago College in Santiago, Chile between 1959 and 1964 when he knew his title had been director and that institution was actually a K-12 pre-collegiate academy for English speaking girls in Chile's capital and largest city.  Basically, as of today in 2004, Defendant Jackson has never come clean with the Lander, South Carolina, and American public about this and other questionable aspects of his total professional credentials.  He knows this and the current Lander University Board of Trustees knows about it, too!

44.  By April 30, 1991, in discussing his approaching retirement slated for June 30, 1992, Defendant Jackson, perhaps sensing the Plaintiff's approaching <u>Hess v. Lander</u> law suit, was coming closer to the reality of the past by discussing his family's  seven years of residence in Santiago, Chile by telling a reporter from <u>The State</u>  newspaper of Columbia, South Carolina that he had spent those seven years as "principal of an American school in Chile."  Actually, he had spent the last four years of them as a "director" of one with the first three being as a United Methodist Church minister of the ecumenical Union (Protestant) Church who self-defrocked in 1959 for unclear reasons.  No longer was he talking about having been "The President of Santiago College."

45.  The previous year in 1990, without consulting the Plaintiff, Defendant Jackson had crippled the political science program by making Defendant Tannenbaum the Director of Lander College's new Honors International Program.  In doing this, the College reduced his teaching to two classes per semester rather than the normal four he had been teaching.  Then in 1991, the South Carolina Commission on Higher Education put that same Lander program on four or five years of probation before a decision would be made as to whether or not it would continue to include a major in that discipline.  Again, Plaintiff Hess was not consulted prior to that Commission making that decision.

46.  In August of 1992, on two consecutive Sunday afternoons around 4:30 p.m., a recent Lander political science major, while walking his huge dog named "Tucker", came by the Plaintiff's house and talked to her for about half an hour on each occasion.  What he told her was indeed ominous.  The first thing he told her was that the two boys who disrupted one of her Spring 1992 classes had done so deliberately to lower her student evaluations and to force her to call in her chairman, Dr. Robert C. Figueira, to "restore order".  Controlling her class, she didn't do that.  The other major thing he told her was even more troubling, namely that Lander University intended to end its

political science major for several years in order to pay her back for suing it (1992-1993). Importantly, he, Scott Bascue, promised her then that he was willing to witness for her if she ever had to go to court against Defendants Jackson and Tannenbaum.

47. However, when August 1993 arrived with its last day being the <u>Hess v. Lander</u> trial day at the Greenville, South Carolina Federal Courthouse, Scott Bascue was not there to testify as to what he had told the Plaintiff on those two August Sunday afternoons of the previous year. He told her that he had taken a management trainee position with Nation's Bank in Abbeville, South Carolina, instead. Early in 1995, one of Scott's younger brothers, both of whom were attending Lander University, told Plaintiff that a Lander University official, which he refused to identify, had told his brother Scott back in June of 1993 that if he testified for Plaintiff Hess his two younger brothers might find it more difficult to graduate from Lander University.

48. Plaintiff Hess lost that July-August, 1993 case because she couldn't prove that Lander University had been discriminating against her because of her gender, her race-brown-skinned Malay, and her country of origin, the Philippines. Federal Judge William Catoe, Jr., who presided over that trial, stated in his verdict rendered on September 14, 1993 that Plaintiff Hess had established a <u>prima facie</u> case that Lander University had discriminated against her.

49. Noteworthy for their absence from the Greenville Federal Courthouse that August day of 1993 was the fact that Lander University's current president Dr. William C. Moran, who had been sponsored as Defendant Jackson's successor by Defendant Jackson, himself, in 1992, was absent from it as were all the Lander University trustees. Shortly thereafter, President Moran told the Plaintiff that he had been in good health that day but had decided to monitor the proceedings from his Lander University campus office.

50. In December of 1994 Lander University named the main hallway of its Grier Student Center after Attorney John E. Johnston of Greenville, South Carolina, who had chaired the Lander College Board of Trustees late in 1991 when it refused to answer Dr. David L. Hess's letter of October 27, 1991 that described Defendant Jackson's embellished professional credentials and the use of students against his teacher wife, Plaintiff Hess. After naming that hallway after Attorney Johnston that evening of Lander's winter commencement of 1994, Defendant President Emeritus Jackson conferred an honorary doctorate of humanities on Mr. Johnston.

51. Early in 1995 Dr. David L. Hess received a large envelope from Kappa Sigma's international headquarters in Charlottesville, Virginia. Inside were copies of Defendant Jackson's two letters that sponsored Lander College's Delta Chi Epsilon into Kappa Sigma. Now, the Plaintiff and her husband were starting to realize what kind of person Defendant Jackson was.

52.  On December 9, 1996 Dr. David L. Hess sent a short one-page letter to all the Lander University trustees deploring the fact that on December 14, 1996 they were going to honor Defendant President Emeritus Jackson with an honorary doctorate at the University's Fall 1996 Commencement after all the letters he had previously sent them concerning his embellished professional credentials and the way he had sanctioned the October 7-10, 1979 student petition against the Plaintiff and the organized disruptions of her classes by his "secret fraternal family members" thereafter.  Then, on December 16, 1996, he wrote the editors of all the major South Carolina newspapers describing what had happened at Lander University on December 14, 1996.

53.  Dr. David L. Hess's letter to Governor James H. Hodges was one of his best whistleblowing ones but was not well received.  Mailed on August 7, 1999, he had failed to acknowledge two months later ever having received it although it was certified and receipt signed by one of his staffers.  Acts of retaliation against it and a similar one sent to all members of the South Carolina General Assembly on August 10, 1999 were very decisive and disastrous to the Plaintiff and her husband.  How so?  David had lost his three classes part-time history teaching job at USC-Aiken by October, 1999 and the Plaintiff had received an intent –to-dismiss letter from Defendant Ball on May 3, 2002. How much more could retaliation have been?

54.  Retaliation at Lander University was seen in the Fall of 1999, with Defendant Jackson's close friend Defendant Tannenbaum undercutting the Plaintiff's teaching of the vital, 3 credit hours, Capstone Research Seminar (Political Science 421), by convincing some of the students not to follow Plaintiff Hess's requirement for original 25-30 pages research papers, but to slightly extend old term papers they had previously done for Defendant Tannenbaum in his Nuclear Politics course, of course without the Plaintiff's consent.  Furious that she wouldn't accept their shoddy, duplicative work, these students, themselves, had other students "mess up" the Plaintiff's course and teacher evaluations from the Fall of 1999 through the Spring of 2002 in some, but not all of the Plaintiff's classes (see Exhibtit J hereof).  There was enough of this to allow Defendant Ball to use them to fire the Plaintiff in 2002.

## FOR THE SEVENTH CAUSE OF ACTION
### (NEGLIGENCE OF PUBLIC RESPONSIBILITY)

55.  By the Lander College Board of Trustees (hereinafter referred to as Defendant Trustees) for not answering the public service letter of October 27, 1991, to it from Dr. David L. Hess, the Plaintiff's husband, regarding the badly embellished professional credential of the College's president Dr. Larry A. Jackson, Defendant Trustees were guilty of negligence tainted with deliberate malice and irresponsibility.

14

56.  During its remaining days of their authority from October 28, 1991 to June 30, 1992, Defendant Trustees willfully failed to answer Dr. David L. Hess's notification letter or inform the public of Defendant Jackson's deceptive credentials.

57.  On December 14, 1994, Attorney John E. Johnston, former chairman of the College's Board of Trustees, had the main hallway of the Lander University Grier Center named "The Johnston Commons".  After that, he accepted an honorary doctorate of humanities from the University's Board of Trustees.

58.  At the same Winter Commencement ceremony in which Attorney Johnston received that honorary doctorate, Defendant Jackson profusely thanked the College-University Defendant Trustees for the support they had given him.

59.  Then at Lander University's Fall Commencement held on December 14, 1996, the University's Defendant Board of Trustees and Lander President Dr. William C. Moran awarded Defendant Jackson an honorary doctorate over the written protests of Dr. David L. Hess who termed this action a deplorable one.

60.  Finally, on December 13, 2002, the University's Defendant Board of Trustees rejected the appeal of the Plaintiff and validated Defendant Ball's October 17, 2002 dismissal of her.

61.  After that, in a brief letter to the Plaintiff dated December 19, 2003 from Mr. Dennis Drew, Education Policy Advisor for Governor Mark Sanford, Mr. Drew stated that the Governor did not have the authority to overrule Lander University's Defendant Board of Trustees.


## FOR THE EIGHTH CAUSE OF ACTION
## (MAINTAINING A HOSTILE WORKING ENVIRONMENT, 1979-2002)

62. On September 18-19, 1979 Defendant Tannenbaum violated the due process rights of Plaintiff Hess by secretly bonding with a small group of Lander College students to plan a petitionary campaign designed to pressure her to resign from her tenured contract with Lander College.

63.  In October-November 1979 Defendant Jackson forced the Plaintiff to teach two classes of College Seminar, supposedly a voluntarily-taught course, in the Spring of 1980.

64. Defendant Jackson secretly sanctioned a student petitionary campaign that lasted from October 7, 1979 to October 10, 1979 which was designed to violate Plaintiff's due

15

(1) In their individual depositions of July 30, 1993, Defendants Jackson and   ;
Tannenbaum both claimed to have forgotten which year Tannenbaum had
been promoted to full professorship;

(2) Defendant Tannenbaum's complete lack of recall in his deposition of July 30,
1993 of a secret letter he had written to Lander College's Academic Dean's
Office, dated January 27, 1978, in which he strongly criticized the Plaintiff
and her Filipino-American accent;

(3) Defendant President Ball's failure to seriously look at an approved mountain
of evidence, between October 15, 2002 and October 17, 2002, before
summarily terminating Plaintiff Hess on the latter date; and

(4) Defendant President Ball's willful and deliberate failure to transfer all the
approved evidence on the Plaintiff's termination issue from himself to the
Appellate Defendant Board of Lander University Trustees.

## FOR THE TENTH CAUSE OF ACTION
## (VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS)

85. On January 17, 2001, Defendant Wiedemann wrote a letter to the Plaintiff
falsely charging her with rumor mongering a married colleague's adulterous affair with
a recently graduated alumna mother.

86. On June 18, 2002, and again on August 8, 2002, defendant President Ball
charged her with making undesignated derogatory remarks on campus, a charge he
eventually used on August 8, 2002 to remove all her faculty privileges, including free
accessibility to her campus office of 20 years (1982-2002).

87. On August 2, 2002 the Plaintiff wrote Defendant President Ball requesting his
permission to speak to faculty peers on August 16, 2002 regarding her suspension by
him on May 6, 2002, which request was rejected.

88. Between December 20, 2002 and February 7, 2002 the Plaintiff requested that
Lander University publicize her termination, but Defendant President Ball refused to
do so. Included in those letters was also Plaintiff's request for severance pay which he
also refused to respond.

89. Between April 7, 2004 and April 9, 2004, Plaintiff Hess hand-delivered 140
envelopes of information to the various departments of Lander University regarding
her suspension and termination. Some of these envelopes were intercepted by
Defendant Ball's request and as of September 1, 2004, she has yet to account for
all of them.

18

## IV.    RELIEF.

State briefly and exactly what you want this court to do for you.

As a result of all of the above discriminatory, arbitrary, and wrongful actions on the part of Lander University (Administrators, Faculty, its Board of Trustees , and Students involved in a civil conspiracy), Plaintiff Dr. Ceferina G. Hess (together with her husband Dr. David L. Hess) have suffered untold pain and suffering, emotional and mental anguish and distress for many years, loss of professional reputation and community standing, and severe or extreme financial hardship and economic loss, among others, especially arising from her wrongful suspension from all academic responsibilities by President Daniel W. Ball and the Lander University Faculty Senate, and her subsequent dismissal by the same person (President Ball) on October 17, 2002, later validated unanimously, on appeal by Plaintiff herein, by that University's Board of Trustees on December 13, 2002.

Furthermore, Plaintiff's emotional pain and suffering were exacerbated by Lander University and Defendants' willful and malicious subjection of Plaintiff to an ongoing course of discrimination, harassment, and retaliation with the intention of making her working conditions very hostile in its atmosphere and almost intolerable to the extent of forcing her to resign her employment from Lander University.  Because of the constant fear that Plaintiff's courses will be taken away during her absence, Plaintiff would have been entitled to two sabbatical leaves of absence with pay, that is one sabbatical leave for research every ten years.

For the reasons above stated, Plaintiff hereby requests this Honorable Court to award her compensatory damages for pain and suffering as well as emotional distress, actual and punitive damages, exemplary damages for loss of pension, retirement benefits, two years severance pay, five years of Teacher and Employee Retention Incentive (TERI) benefits, other lost earnings and income, plus attorneys fees and other legal fees, including postage, xeroxing/printing, and other incidental expenses incurred, collectively or in the aggregate sum of TEN MILLION DOLLARS. Plaintiff also seeks Emeritus Status for her retirement from Lander University.

Finally, Plaintiff prays that an additional punitive award be granted in an amount sufficient to impress upon the Defendants the seriousness of their conduct and to deter such similar conduct in the future, together with the costs of this action, and such further relief as the Court deems just and appropriate.

## I declare under penalty of perjury that the foregoing is true and correct.

Signed this _3rd_ day of __September__ , 200_4_.

_____
Signature of Plaintiff Pro Se
CEFERINA G. HESS
320 Lawson Street
Greenwood, S.C. 29649

20